John F. "Jack" WALSH, et
al., Appellees,

v.

FORD MOTOR COMPANY, Appellant.

No. 85–5879.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 18, 1986.

Decided Dec. 19, 1986.

Richard C. Warmer and William T. Coleman, Jr., with whom Carl R. Schenker, Jr., John H. Beisner, Aaron S. Bayer and Barbara L. Strack, Washington, D.C., were on brief for appellant.

Beverly C. Moore, Jr., with whom Landon Gerald Dowdey, Washington, D.C., was on brief for appellees.

Before EDWARDS, RUTH B. GINSBURG and STARR, Circuit Judges.

GINSBURG, Circuit Judge.

HARRY T. EDWARDS, Circuit Judge and RUTH B. GINSBURG, Circuit Judge:

Plaintiffs-Appellees, who proposed to represent several million owners of Ford automobiles, initiated the instant suit against Ford Motor Company to pursue breach of warranty claims by means of class actions. The appellees' suit arises under the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act ("Magnuson-Moss" or the "Act"); [1] the es-

sence of appellees' complaint is that certain Ford models suffer from a transmission defect that causes the automobiles to slip out of the "park" position and into "reverse."

In order to obtain class action certification under Rule 23 of the Federal Rules of Civil Procedure, appellees grouped their breach of warranty claimants into three principal categories: one group ("written warranty incidents" class) included all Ford owners who had allegedly experienced a "park-to-reverse" incident within Ford's 12,000 mile/12 month written warranty period; the second group ("implied warranty incidents" class) included every Ford owner who allegedly experienced a park-to-reverse incident; and the third group ("all-owners" class) included all owners of an allegedly defective Ford vehicle, without regard to whether the owner had ever experienced a park-to-reverse incident. Citing a variety of legal objections, Ford opposed class certification; in particular, Ford argued that none of the appellees' proposed claimant groups was a cognizable "class" under Rule 23.

Although the District Court recognized that appellees' proposed class groupings raised some difficult legal issues under Rule 23, the trial judge nevertheless conditionally certified all three classes. The District Court decided to apply Rule 23 only where it is consistent with the terms and intent of Magnuson-Moss; therefore, having found that Magnuson-Moss reflects a congressional intent liberally to allow class actions as a device to facilitate consumers' recovery for breach of warranties, the District Court concluded that appellees' proposed classes should be certified as suggested. The effect of this ruling was to allow appellees to avoid the strict requirements of class certification under Rule 23.

Given the importance of the legal questions at issue, and the enormity of the litigation presently contemplated, the District Court approved appellant's request for interlocutory review under 28 U.S.C.

1. 15 U.S.C. §§ 2301–2312 (1982).

§ 1292(b). On November 7, 1985, this court granted interlocutory appeal on the issue of class certification.[2]

Because we find that the District Court's decision to certify appellees' classes was based in significant part on an improper construction of Magnuson-Moss, rather than on a normal application of Rule 23, we vacate and remand for further consideration as to whether any class certification is appropriate under unmodified Rule 23 standards.

## I. BACKGROUND

### A. *Factual Background*

The plaintiffs-appellees brought this action under section 110 of Magnuson-Moss,[3] alleging that the defendant-appellant, Ford Motor Company, breached both its implied and written warranties of merchantability by marketing defectively designed automobiles. In particular, the appellees alleged that 1976–79 (and 1980 pre-design change) Ford vehicles equipped with FMX, C–3, C–4 and C–6 automatic transmissions suffer from a defect that causes the automobiles to slip out of the "park" position and into "reverse."[4] The appellees, claiming to represent several million Ford owners, sought to pursue their breach of warranty claims by means of class actions. For the purpose of obtaining class action certification, they grouped their principal claims into three broad categories. The first group ("written warranty incidents" class) consisted of all Ford owners who allegedly experienced a park-to-reverse incident within Ford's 12,000 mile/12 month written warranty period. This group sought certification under Rule 23(b)(3) to recover property damages incurred in these incidents.[5] The second group ("implied warranty incidents" class) consisted of all Ford owners who allegedly experienced a park-to-reverse incident. This group also sought certification under Rule 23(b)(3) to recover property damages. The third group ("all-owners" class) consisted of *all* owners of

---

2. The decision whether to grant an interlocutory appeal from an *order* of a district court under § 1292(b) is within the discretion of the court of appeals. Before the court of appeals may exercise that discretion, however, the district court must certify that the order involves "a controlling question of law as to which there is substantial ground for difference of opinion," and that an immediate appeal "may materially advance the ultimate termination of the litigation." In the instant case, the District Court certified as "controlling" only one of the legal issues that we deem it necessary to address on appeal. *See* Memorandum Opinion, *reprinted in* Record Excerpts ("R.E.") Tab 8 (certifying the question whether class representatives in class actions brought under Magnuson-Moss are required to send individual notice to all class members whose names and addresses may be ascertained through reasonable effort). Section 1292(b) explicitly provides, however, that the appeal is from an *order* of the district court, not from the particular question that the district court found controlling. We are therefore called upon to decide an appeal, not a single question of law. Accordingly, we must decide *all* questions of law necessary to the proper disposition of this appeal. *See, e.g., Nuclear Eng'g Co. v. Scott,* 660 F.2d 241, 246 (7th Cir.1981), *cert. denied,* 455 U.S. 993, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982); *Johnson v. Alldredge,* 488 F.2d 820, 822–23 (3d Cir.1973), *cert. denied,* 419 U.S. 822, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974). Neither party to this appeal disputes this well-established principle.

3. 15 U.S.C. § 2310 (1982).

4. In 1977, in response to similar complaints of park-to-reverse incidents involving Ford automobiles, the National Highway Traffic Safety Administration ("NHTSA") initiated an investigation to determine whether Ford transmissions were defective. That investigation culminated in a settlement in which Ford agreed to send warning labels to Ford owners instructing them to place their transmissions securely in "park," turn off the engine and set the parking brake before leaving their car. *See Center for Auto Safety, Inc. v. Lewis,* 685 F.2d 656, 661 (D.C.Cir. 1982). NHTSA did not, however, make a final determination under 15 U.S.C. § 1412(b) (1982) that the Ford transmissions were defective. 685 F.2d at 662–63. In the absence of such a final determination, this court rejected a challenge by the Center for Auto Safety to the authority of NHTSA to settle the case without compelling Ford to repair or replace the allegedly defective transmissions. *Id.*

5. FED.R.CIV.P. 23(b)(3) authorizes a district court to certify a class if it finds that questions of law or fact common to the class predominate over questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

an allegedly defective Ford vehicle, without regard to whether the owner had experienced an actual park-to-reverse incident.[6] This group sought certification under Rule 23(b)(3) to recover damages equal to the difference in value between the transmissions as received and as warranted; or, in the alternative, certification under Rule 23(b)(2) to compel Ford to repair the defective vehicles.[7] The appellees also asked the District Court to certify two additional "incidents" classes, one to recover punitive damages and the other to pursue personal injury claims.

Before the District Court, Ford opposed class certification on numerous grounds.[8] Under Rule 23(b)(3), Ford observed, a district court may not certify a class unless it finds that "questions of law or fact common to the members of the [proposed] class predominate over any question affecting only individual members." With respect to the implied warranty classes, Ford argued, it could not be found that common questions of *law* predominated, because Magnuson-Moss defines implied warranties as those arising under state law,[9] and there are material variations in state laws governing the interpretation of implied warranties.[10] With respect to *all* the proposed classes, Ford argued, it could not be found that common questions of *fact* predominat-

ed, because the appellees had not proffered any proof that the four different transmissions (the FMX, C–3, C–4 and C–6) suffered from a common defect.[11] With respect to the "incidents" classes, Ford argued, it again could not be found that common questions of fact predominated, because each plaintiff would be required to make an individual showing that her accident was caused by Ford's allegedly defective design.

Ford also argued that certification of an "all-owners" class was improper in light of the appellees' concession that they could not bear the cost of providing individual notice of the action to the several million absentee class members. As interpreted in *Eisen v. Carlisle & Jacquelin,* Ford observed, Rule 23(c)(2) requires proposed plaintiff class representatives to send individual notice to all class members whose names and addresses may be ascertained through reasonable effort, irrespective of the financial burden placed on the plaintiffs by this requirement. 417 U.S. 156, 176, 94 S.Ct. 2140, 2151, 40 L.Ed.2d 732 (1974) ("[I]ndividual notice to identifiable class members is not a discretionary consideration to be waived in a particular case. It is, rather, an unambiguous requirement of Rule 23.... There is nothing in Rule 23 to

---

**6.** This proposed class consisted primarily of Ford owners raising implied warranty claims. However, the class also included members of the proposed "written warranty incidents" class.

**7.** FED.R.CIV.P. 23(b)(2) authorizes a district court to certify a class to pursue injunctive or declaratory relief if it finds that the defendant "has acted or refused to act on grounds generally applicable to the class." Rule 23(b)(2) may not be invoked, however, where "the appropriate final relief relates exclusively or predominantly to money damages." FED.R.CIV.P. 23(b)(2) advisory committee's note (1966 amendment).

**8.** Ford has renewed these arguments with equal vigor on appeal.

**9.** *See* 15 U.S.C. § 2301(7) (1982).

**10.** In particular, Ford identified supposed variations in state laws governing what constitutes a breach of implied warranty, what constitutes

sufficient notice of breach, the validity of durational limitations and the availability of affirmative defenses. *See* Brief of Appellant at 35–37.

At an earlier stage of the litigation, the District Court had recognized that states differed on the question whether a party not in vertical privity with a manufacturer may recover from the manufacturer for breach of implied warranty. In light of this problem, the District Court excluded from the proposed implied warranty classes those members who resided in states that required vertical privity. *See Walsh v. Ford Motor Co.,* 588 F.Supp. 1513, 1524–35 (D.D.C. 1984).

**11.** Ford also contended that the four transmission types had been used in connection with numerous column designs and linkage systems, all of which operated in tandem to control the shifting of gear positions between "park" and "reverse." Thus, Ford claimed, there were approximately 20 different transmission *systems,* each of which would have to be examined separately to determine if the *system* was defective. *See* Brief of Appellant at 54–55.

suggest that the notice requirements can be tailored to fit the pocketbooks of particular plaintiffs.") In addition, Ford argued, individual notice was required by procedural due process, for without such notice, absentee class members would be deprived of the opportunity to be heard or to opt out of the litigation.

### B. *The District Court's Opinion*

The District Court found that none of the above arguments foreclosed class certification under Rule 23(b)(3). Accordingly, the trial judge conditionally certified an "all-owners" class,[12] an "implied warranty incidents" class and a "written warranty incidents" class.[13]

Before addressing Ford's Rule 23 arguments, however, the District Court examined the statutory framework of Magnuson-Moss to determine the extent to which Rule 23 applies to class actions brought under the Act. Section 110 of the Act establishes jurisdictional requirements for a class action brought in federal district court. In particular, the Act requires that there be at least 100 named plaintiffs, that each individual claim exceed $25 and that the aggregate claims exceed $50,000.[14] The Act also provides that a plaintiff may *file* a class action, but may not *proceed* with that action, until she has afforded the defendant a reasonable opportunity to cure its alleged breach. While the class action is held in abeyance pending possible cure, the district court may rule on the representative capacity of the named plaintiffs, its determination to be made "in the application of rule 23 of the Federal Rules of Civil Procedure."[15]

The appellees contend that these statutory provisions evince a congressional intent that Rule 23 should apply to Magnuson-Moss class actions only to the extent necessary to determine the representative capacity of the named plaintiffs. Congress, they argue, would not have explicitly mentioned Rule 23 in a particular context had it meant for Rule 23 to apply across the board.[16] The fact that Congress specified the circumstance under which Rule 23 would apply, and delineated the jurisdictional requirements for a class action in federal court, purportedly suggests that Congress may have intended to create a

---

**12.** The District Court rejected the appellees' alternative motion for certification of a Rule 23(b)(2) recall/retrofit equitable relief class, finding that the principal relief they sought was damages. *Walsh v. Ford Motor Co.*, 106 F.R.D. 378, 391–92 (D.D.C.1985); *see* note 7 *supra*.

**13.** *Walsh*, 106 F.R.D. at 414. The District Court did not certify either a personal injury incidents class or a punitive damages incidents class. It explicitly rejected certification of a personal injury class, finding that the appellees' personal injury claims, unlike their Magnuson-Moss warranty claims, arose *"exclusively"* under state law. *Id.* at 405 (citing 15 U.S.C. § 2311(b)(2), which provides that personal injury claims may not be brought under Magnuson-Moss) (emphasis in opinion). The court found that the application of "56" potentially variant state laws would present "intractable management problems." *Id.* While the Magnuson-Moss claims also presented "formidable" manageability problems, the court felt obliged to tackle those problems "because of the expressed intent by Congress to afford consumers effective methods to pursue their claims for breach of warranty through the class-action vehicle." *Id.*

The court reserved judgment on the punitive damages class pending briefing on the question

whether punitive damages are available under Magnuson-Moss. *Id.* at 408–09. The court has since refused to certify a punitive damages class, finding that Magnuson-Moss does not displace the various state laws on the availability of punitive damages for breach of warranty. *Walsh v. Ford Motor Co.*, 627 F.Supp. 1519, 1522–26 (D.D.C.1986).

**14.** 15 U.S.C. § 2310(d)(3) (1982).

**15.** *Id.* § 2310(e).

**16.** *See* Brief of Appellees at 16–17. *See also* C. REITZ, CONSUMER PROTECTION UNDER THE MAGNUSON-MOSS WARRANTY ACT 100 (1978) ("Since no mention of Rule 23 is made anywhere else in the Act, unless this sentence is treated as a meaningless redundancy, it can only signal that the remainder of Rule 23 does not apply."); Statutory Commentary, *The Magnuson-Moss Act Class Action Provisions: Consumers' Remedy or an Empty Promise?*, 70 Geo. L.J. 1399, 1409 (1982).

As will be made clear later in this opinion, we find appellees' contention on this point to be specious. There is no warrant to find that Congress intended to eliminate the requirements of Rule 23 with the passage of Magnuson-Moss.

" 'self-contained' class action regime" under which those portions of Rule 23 not explicitly mentioned in the statute would not apply.[17]

The District Court wisely rejected this contention, refusing to "read section 110 [15 U.S.C. § 2310 (1982)] so broadly as to have it supersede the Rule 23 class action provision."[18] *However,* the court did interpret Magnuson-Moss as mandating a somewhat looser application of Rule 23. In particular, the court found that it should apply Rule 23 only where "it is consistent with the terms and intent of Magnuson-Moss."[19]

In accordance with this view, the District Court set out to apply Rule 23 "against the backdrop of Magnuson-Moss and Congress' intent to provide class actions as a form of recovery to consumers for breach of written and implied warranty."[20] First, the court rejected Ford's argument that material variations in the Ford transmissions precluded a finding that common questions of fact predominated. As to the four transmission *types,* the court reserved judgment on whether the appellees could prove that the transmissions were "sufficiently and materially similar so as to permit them to be included in a single class."[21] It did find, however, that the appellees had "credibly alleged" common defects as to the four transmissions.[22] The court found that it could separate each transmission type into a subclass if it concluded at a later stage of the litigation that such a division was necessary. As to the more numerous transmission *systems,* the court was "not convinced" that the differences alleged by Ford were "material enough" to prevent classwide proof on the issue of defective design.[23] Again, the court appeared to reserve the option of subdividing classes at a later date should its initial judgment prove erroneous.

Second, the court refused to accept Ford's argument that state law variations precluded a finding that common questions of law predominated. Importantly, the court did not reject Ford's contention that state law variations existed. Rather, the court found it unnecessary for purposes of class certification to decide *which* state law applied,[24] maintaining that "[t]o conclude that a court must look to the many States, with their varying judicial interpretations of what constitutes breach of implied warranty, would make it virtually impossible to apply the Act in multi-State class actions for Magnuson-Moss breach of implied warranty claims."[25] The court thus concluded that it could not deny class certification because of "potential" state law variations, for to do so would, in effect, repeal a "congressionally-mandated Federal cause of action."[26] The court further concluded that potential state law variations did not bar certification of a *written* warranty class, because Magnuson-Moss "explicitly defines written warranty and establishes a cause of action for breach of said warranty."[27]

Third, the court found that individual issues of causation did not bar certification of an "implied warranty incidents" class. To overcome the existence of individual causation issues, the court opined, the appellees could rely on class-wide technical and statistical proof demonstrating that Ford vehicles experienced an extremely high rate of park-to-reverse incidents and suffered from common defects in their

---

17. Brief of Appellees at 18–19.

18. *Walsh,* 106 F.R.D. at 387.

19. *Id.*

20. *Id.* at 388.

21. *Id.* at 394.

22. *Id.* at 395.

23. *Id.*

24. *Id.* at 396 n. 12.

25. *Id.* at 396.

26. *Id.* at 395.

27. *Id.* at 404 (citing 15 U.S.C. §§ 2301(6), 2302–2304, 2310(d)(1) (1982)).

transmissions.[28] Combined with direct proof that intervening causes were unlikely, this evidence could establish a *"prima facie* presumption" that *each* park-to-reverse incident was attributable to Ford's defective transmission design.[29] Such a "rebuttable presumption," the court found, would be consistent with the remedial purposes of the Act.[30] To require instead that the members of the proposed incidents class "prove individually that the design defect was the cause in fact of a 'park-to-reverse incident' would surely preclude the use of class action procedures for breach of implied warranty under the Magnuson-Moss Act." [31]

Finally, the court held that it could certify an "all-owners" class without requiring the appellees to provide individual notice of the action to absentee class members. Relying principally on a passage from a House Committee Report, the court found that Congress had intended for *Eisen* not to apply to class actions brought under Magnuson-Moss.[32] At the conclusion of its discussion of *Eisen*, the court characterized its decision with respect to individual notice, as well as with respect to the other class certification issues, as an attempt "to effect [the Act's remedial] purposes by providing a reasonable interpretation of the Act." [33] The court went on to find that the appellees' inability to provide individual notice would not deprive absentee class members of procedural due process, because the absentee class members were adequately represented, which is all that due process requires.[34]

## II. DISCUSSION

### A. *The Interplay Between Rule 23 and Magnuson-Moss*

We recognize that certain aspects of a district court's determinations under Rule 23—such as whether common questions of fact or law predominate—are entitled to a measure of deference from an appellate court.[35] However, it is unquestionably the role of an appellate court to ensure that class certification determinations are made pursuant to appropriate legal standards.[36] In the instant case, we find that the District Court's class certification rulings were made under an erroneous legal standard, and must therefore be reversed.

A consistent theme pervading the trial court's opinion is that the remedial purposes of Magnuson-Moss compelled it to bend the requirements of Rule 23 in order to facilitate the maintenance of a class action. Nothing in Magnuson-Moss, however, licenses a district court to manipulate Rule 23 in order to ensure the pursuit of a class action in federal court. Although the Act creates federal jurisdiction over class actions that meet specified jurisdictional requirements,[37] it plainly does not *mandate* that district courts entertain such actions regardless of whether they are cognizable under Rule 23. Congress passed Magnuson-Moss in part to create additional remedies for breach of warranty, and to allow

28. *Id.* at 399.

29. *Id.*

30. *Id.* at 402.

31. *Id.*

32. *Id.* at 409–11.

33. *Id.* at 412.

34. *Id.* at 412–13.

35. *See, e.g., Katz v. Carte Blanche Corp.,* 496 F.2d 747, 756 (3d Cir.) (en banc) ("If the district court has properly identified the issues common and diverse, we would undoubtedly defer in most instances to its conclusion as to predominance, since that requirement relates to the conservation of litigation effort, and the trial court's judgment probably will be as good as ours."), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974).

36. *See Gulf Oil Co. v. Bernard,* 452 U.S. 89, 100–01, 101 S.Ct. 2193, 2200, 68 L.Ed.2d 693 (1981) (district court's discretion to administer class actions is bounded by the relevant provisions of the Federal Rules, and exercise of this discretion is subject to appellate review); *Katz,* 496 F.2d at 756 (appellate court must decide whether mandates of Rule 23 have been satisfied).

37. 15 U.S.C. § 2310(d)(1)(B) (1982).

for the *possibility* of class actions in federal court. Congress' primary purpose in enacting Magnuson-Moss, however, was to provide minimum disclosure and content standards particularly for written warranties, *not* to actively promote class actions in federal court.[38]

In short, the District Court was required to analyze the appellees' motion for class certification under traditional Rule 23 standards. We flatly reject the District Court's assessment that Rule 23 may be applied less stringently in Magnuson-Moss cases in order to effectuate the statute's remedial purposes.[39] The Federal Rules of Civil Procedure are to be applied in all civil actions absent a *direct expression* of congressional intent to the contrary.[40] As will be discussed more fully below, Magnuson-Moss contains no such direct expression. For this reason, and for the reasons that follow, we must remand this case to the District Court to determine

what classes, if any, may be certified *under Rule 23*.

**B.  Individual Notice**

The District Court's most conspicuous departure from Rule 23 standards was its decision to relieve the appellees of their obligation to provide individual notice to all members of the proposed "all-owners" class. Rule 23(c)(2), as interpreted by the Supreme Court in *Eisen*, requires that individual notice be sent to all class members whose names and addresses may be ascertained through reasonable effort.[41] The appellees did not contend before the District Court that they would be unable to identify the absentee class members through reasonable effort. Rather, they maintained that they would be financially unable to send the requisite notice. *Eisen*, however, explicitly held that individual notice is an absolute requirement of Rule 23(c)(2), not to be "tailored to fit the pocketbooks of particular plaintiffs."[42] Ac-

---

**38.** The Act itself is entitled "AN ACT [t]o provide minimum disclosure standards for written consumer product warranties; to define minimum Federal content standards for such warranties; to amend the Federal Trade Commission Act in order to improve its consumer protection activities; and for other purposes." Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, Pub.L. No. 93–637, 88 Stat. 2183 (1975); *see also* C. REITZ, *supra* note 16, at 23 ("The principal threefold purposes of the Magnuson-Moss Warranty Act, declared in the Act itself, are 'to improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products.'") (citing 15 U.S.C. § 2302(a)); *id.* at 1 ("The Act is also concerned with the means of vindicating the warranty rights of buyers.... This is accomplished mainly by providing easy and realistic access by aggrieved consumers to *state* courts.") (emphasis added).

**39.** *Cf. Board of Governors v. Dimension Fin. Corp.,* — U.S. ——, 106 S.Ct. 681, 688–89, 88 L.Ed.2d 691 (1986):

The "plain purpose" of legislation ... is determined in the first instance with reference to the plain language of the statute itself. Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in

its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard fought compromises. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent. (citation omitted).

**40.** *Califano v. Yamasaki,* 442 U.S. 682, 700, 99 S.Ct. 2545, 2557, 61 L.Ed.2d 176 (1979); *cf. East Texas Motor Freight Sys. v. Rodriguez,* 431 U.S. 395, 405, 97 S.Ct. 1891, 1897, 52 L.Ed.2d 453 (1977) (although suits alleging racial or ethnic discrimination are often by their very nature class suits, careful attention to the requirements of Rule 23 remains indispensable); *Windham v. American Brands, Inc.,* 565 F.2d 59, 64 n. 6 (4th Cir.1977) (en banc) (rejecting view of panel opinion, 539 F.2d 1016, 1021, that remedial purposes of Sherman Act created a "rebuttable presumption" in favor of class action treatment for anti-trust suits; such a view would conflict with the rule that the proponent of class certification bears the burden of establishing the right to certification under Rule 23), *cert. denied,* 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978).

**41.** 417 U.S. at 173, 94 S.Ct. at 2150.

**42.** *Id.* at 176, 94 S.Ct. at 2152.

cordingly, unless *Eisen* is somehow inapplicable to class actions brought under Magnuson-Moss, the District Court erred in relieving the proposed representatives of the "all-owners" class of their obligation to provide individual notice to absentee class members.

As noted above, the Supreme Court has held that the Federal Rules of Civil Procedure are to be applied in all civil actions absent a "direct expression" of congressional intent to the contrary.[43] The statutory language of Magnuson-Moss contains no reference to Rule 23(c)(2) or to *Eisen*, much less a "direct expression" that the requirement of individual notice is not to obtain in class actions brought under the Act. When Congress has meant to limit *Eisen* it has known precisely how to do so, as evidenced by its treatment of the notice requirement in the Deepwater Port Act of 1974. In that Act, Congress specified in the statute that when the size of the proposed class exceeded one thousand, Rule 23(c)(2) would be satisfied by notice in the *Federal Register* and in local newspapers.[44] Magnuson-Moss contains no comparable language evincing a congressional intent to modify Rule 23(c)(2).

The District Court, however, found the requisite "direct expression" of congressional intent in the legislative history of Magnuson-Moss. The court relied principally on the following language contained in the Report of the House Interstate and Foreign Commerce Committee:

The purpose of [the Act's] jurisdictional provisions is to avoid trivial or insignificant actions being brought as class ac-

tions in the federal courts. However, if the conditions of this section are met ... [s]ection 110(d) should be construed reasonably to authorize the maintenance of a class action.... [T]his section is remedial in nature and is designed to facilitate relief which would otherwise not be available as a practical matter for individual consumers. In particular, assuming that other requirements for a class action are met, your Committee does not believe that the requirement of individual notice to each potential class member should be invoked to preclude a class action where the identification and notification of the class members is not possible after reasonable effort by the plaintiff. *In considering whether identification and notification of all members of the class is possible with reasonable effort, the particular circumstances of the plaintiff or plaintiffs should be carefully evaluated by the court, including the question of whether the financial burden of such identification and notification would be likely to deny them relief.*[45]

Although the House Committee Report did not mention *Eisen* by name,[46] the trial court read the above language as an indication that Congress meant for *Eisen* not to apply in Magnuson-Moss class actions.[47] As further support for this view, the trial court cited the floor statements of two House members, one of which explicitly mentioned *Eisen*, and both of which embraced the views expressed in the House Report.[48] Finally, the court noted that the Senate-House Conference Committee had

---

43. *Califano*, 442 U.S. at 700, 99 S.Ct. at 2557.

44. 33 U.S.C. § 1517(i)(2) (1982).

45. H.R.Rep. No. 1107, 93d Cong., 2d Sess. 42, *reprinted in* 1974 U.S.Code Cong. & Admin. News 7702, 7724 (emphasis added).

46. *Eisen* was decided on May 28, 1974. The House Committee Report was dated June 13, 1974.

47. *Walsh*, 106 F.R.D. at 410. Importantly, this passage, relied upon heavily by the District Court as evidence of the need to decide class certification issues in a manner consistent with

the statute's remedial purposes, *see* 106 F.R.D. at 386, 410–12, states that a class action may be brought in federal court if the statute's jurisdictional requirements are satisfied *and* if the "other requirements for a class action are met." This language surely does not indicate that Congress intended to displace Rule 23 in class actions brought under the Act.

48. *Id.* at 410 (citing 120 Cong.Rec. 31,738 (1974) (statement of Rep. Vanik); 120 Cong.Rec. 32,013 (1974) (statement of Rep. Badillo) (extension of remarks)).

adopted the class action provisions contained in the House bill,[49] inferring from this that the Senate concurred in the views expressed in the House Report.

There is a firm presumption that the Federal Rules of Civil Procedure apply in all civil actions; nothing in Magnuson-Moss itself indicates that Congress meant to vitiate or reduce the requirements of Rule 23. The legislative history appellees cite, even if it is properly proposed for our consideration,[50] falls far short of a "direct expression" that Congress intended to truncate the Rule or overrule *pro tanto* the Supreme Court's decision in *Eisen.*

The appellees would have us rely on that portion of the statute providing that "the representative capacity of the named plaintiffs shall be established in the application of rule 23 of the Federal Rules of Civil Procedure." [51] According to the appellees, the specific mention of Rule 23 in a particular context suggests a congressional intent to dispense with Rule 23 requirements in all other contexts. At a minimum, they argue, the explicit mention of Rule 23 creates an ambiguity concerning *which portions* of Rule 23 Congress meant to apply in Magnuson-Moss class actions.[52]

Although we recognize that some commentators have interpreted the Act in the manner urged upon us by appellees,[53] we firmly reject the suggestion that Magnuson-Moss was intended to preclude application of any Rule 23 requirements. Appellees' argument to the contrary is based on a tortured and, in our judgment, untenable reading of the Act. Before any action—including a class action—alleging breach of

warranty under Magnuson-Moss may proceed, the plaintiffs must afford the defendant a reasonable opportunity to cure its alleged breach. Under section 110(e), however, a class action may proceed at an earlier time for the limited purpose of establishing the representative capacity of the named plaintiffs.[54] Section 110(e) further provides that this *initial* determination of representative capacity is to be made in accordance with Rule 23 standards. The obvious reason for the statutory reference to Rule 23, then, was to clarify that courts are to apply the same standards in making the Magnuson-Moss *initial* determination of representative capacity as would otherwise be applied in a typical Rule 23 proceeding. We refuse to believe that Congress, in clarifying that Rule 23 would apply to an initial determination of representative capacity, intended, *sub silentio*, to render the remainder of Rule 23 inapplicable.[55]

To the extent that recourse to legislative history is appropriate, however, we again fail to discern any "direct expression" of congressional intent to eliminate the individual notice requirement as interpreted by the Supreme Court in *Eisen.* The most persuasive piece of legislative history cited by the appellees is the passage in the House Report in which a majority of Committee members opined that the requirement of individual notice should not be permitted to burden the maintenance of class actions under Magnuson-Moss. These views, however, apparently were penned prior to the Supreme Court's decision in *Eisen,* as evidenced by the fact that

49. *Id.* (citing S.Conf.Rep. No. 1408, 93d Cong., 2d Sess. 27 (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News 7702, 7759). The Senate version of the bill, S. 356, made no specific mention of class actions. *See* S.Rep. No. 151, 93d Cong., 1st Sess. 37–38 (1973).

50. *Cf., e.g., Washington Water Power Co. v. FERC,* 775 F.2d 305, 315 (D.C.Cir.1985) ("The Act itself is sufficiently clear on its face so as not to require or authorize recourse to legislative history.").

51. 15 U.S.C. § 2310(e) (1982).

52. Brief of Appellees at 16–17.

53. *See* note 16 *supra.*

54. 15 U.S.C. § 2310(e) (1982).

55. *Cf. In re General Motors Corp. Engine Interchange Litig.,* 594 F.2d 1106, 1134–35 n. 50 (7th Cir.) ("The explicit mention of the applicability of Rule 23 bolsters our conclusion that Rule 23(e) [governing approval of class action settlements] is applicable to class actions maintained under [Magnuson-Moss]."), *cert. denied,* 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979).

the majority conspicuously failed to mention *Eisen* by name.[56] It seems most likely that the Committee, far from seeking to displace any Rule 23 requirement, was simply indicating what the legislators thought the Rule meant prior to the Supreme Court's definitive interpretation in *Eisen*.

Of greater significance is the fact that the House Committee's views on individual notice were never considered or adopted by the full Congress. As the District Court observed, the Senate-House conferees adopted the class action provisions contained in the House bill.[57] However, neither the statutory language agreed upon in conference nor the Conference Committee Report[58] made any reference to Rule 23(c)(2) or *Eisen*.[59] At most, then, the House Committee's desire to soften the individual notice requirement was shared only by members of the House, perhaps only by a majority of the House Committee. The matter was never pursued in the Senate, either by means of statutory amendment or in the Conference Committee Report. More important, *neither* body of Congress focused on the applicability of *Eisen* to class actions brought under Magnuson-Moss, much less expressed a definite intent that *Eisen* not apply.[60]

---

**56.** As noted earlier, *see* note 46 *supra*, the House Report was issued approximately two weeks after the decision in *Eisen*. It is evident, however, that the Committee had no opportunity to evaluate the impact of *Eisen* on class actions brought under Magnuson-Moss. Indeed, after *Eisen* was decided, a minority of committee members appended their separate views to the Committee Report, explicitly noting that

> This bill addresses only the jurisdictional questions involving the use of class actions in breach of warranty cases. The Committee did not address the questions involved with the requirements of Rule 23 and, inasmuch as the United States Supreme Court in the recent *Eisen* case made it clear that "the express language and intent of Rule 23(c)(2) leave no doubt that individual notice must be provided to those class members who are identifiable through reasonable effort", we feel that those whose rights are potentially affected by a class action are now protected by that notice.

H.R.Rep. No. 1107, 93d Cong., 2d Sess. 88, *reprinted in* 1974 U.S. Code Cong. & Admin.News 7702, 7753–54.

**57.** *Walsh,* 106 F.R.D. at 410.

**58.** Statements in conference committee reports are "particularly weighty" indicators of congressional intent, as they reflect the final legislative compromise between the delegations from the two Houses of Congress. *Planned Parenthood Fed'n v. Heckler,* 712 F.2d 650, 657–58 n. 36 (D.C.Cir.1983) (quoting Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term,* 68 Iowa L.Rev. 195, 201 & n. 49 (1983)).

**59.** As noted earlier, *see* note 49 *supra*, the Senate bill made no special provision for class actions. Indeed, under the jurisdictional requirements imposed by the Senate bill, class actions in federal court would have been virtually impossible. *See* note 60 *infra.* The compromise reached in Congress was to alter the Senate's jurisdictional requirements in order to create the *possibility* of class actions in federal court. *Id.* There is absolutely no evidence that the conferees considered the question whether Rule 23(c)(2), as interpreted in *Eisen,* applied to class actions brought under the Act.

**60.** We assign no value to the statements of Representatives Vanik and Badillo, who were neither sponsors of the bill nor members of the committee which reviewed the legislation. Their isolated comments about individual notice reflect their personal views of the legislation rather than the intent of the legislative body. *Cf. Castaneda-Gonzalez v. Immigration and Natur. Serv.,* 564 F.2d 417, 424 (D.C.Cir.1977) ("Statements by individual legislators should generally be given little weight when searching for the intent of the entire legislative body.").

The appellees also point to a statement by Representative Moss, who *was* a sponsor of the legislation. After the bill emerged from conference, Representative Moss explained to his colleagues that

> In order that [a breach of warranty] suit be brought in a Federal district court, the amount in controversy would have to exceed $50,000 and each individual claim would have to exceed $25. The [conference] report authorizes class actions, provided these conditions are met and also where there are at least 100 named plaintiffs notwithstanding any restrictions on such actions which might exist under general principles of Federal law.

120 Cong.Rec. 41,405–06 (1974).

According to the appellees, one of the "restrictions" to which Magnuson-Moss class actions would not be subject was the requirement of individual notice. From the context of Representative Moss' remarks, however, it is clear that he was not referring to Rule 23 or the individual notice requirement. Under the Senate bill, a breach of warranty claim could only be brought in federal court under 28 U.S.C. § 1331. *See* S.Rep. No. 151, 93d Cong., 1st Sess. 38 (1973). At that time, 28 U.S.C. § 1331 had

In short, there is nothing in the language of Magnuson-Moss to suggest that Congress meant to eliminate the individual notice requirement as interpreted by the Supreme Court in *Eisen.* Nor can such an intent be inferred from those pieces of legislative history indicating some congressional discontent with the individual notice requirement. When Congress has intended to limit *Eisen,* it has done so expressly, as in the Deepwater Port Act of 1974. We therefore hold that the District Court erred in relieving the appellees of their obligation to adhere to *Eisen*'s individual notice requirement with respect to any class *properly certifiable under Rule 23(b)(3).* It is to this latter issue—*i.e.,* whether *any* class met the standards for certification established by Rule 23(b)(3)—that we now turn. In light of our holding that Rule 23(c)(2) applies to class actions brought under Magnuson-Moss, we need not reach the question whether individual notice is mandated by due process.

## C. *The Predominance Inquiry*

As recounted in Part I.B., the District Court conditionally certified three classes, each pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.[61] Two of the certified classes involved implied warranty claims, one concerned written warranties. For each of the three conditionally certified classes, the District Court announced the requisite Rule 23(b)(3) "find[ing] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." That essential finding, we conclude, is flawed and must be vacated so that the District Court can consider the matter anew.

Concerning the applicable law, the District Court correctly stated that under the terms of Magnuson-Moss,[62] state law governs the existence and basic meaning of implied warranties.[63] That court apparently believed, however, that the federal Act alone, uncomplicated by "any State law variations," covered the class members' "claims for breach of written warranty." [64] On the matter of class-wide proof crucial to all three certifications, the District Court determined that differences in the transmission systems at issue were not so mate-

---

been interpreted to require each member of a proposed class to assert a claim in excess of $10,000. *See Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). In conference, this potentially insuperable obstacle to federal court jurisdiction over class actions was removed in favor of the jurisdictional requirements described by Representative Moss. *See* S.Conf.Rep. No. 1408, 93d Cong., 2d Sess. 27, *reprinted in* 1974 U.S.Code Cong. & Admin.News 7702, 7759. In describing this compromise, Representative Moss could only have been referring to the elimination of this barrier to federal court jurisdiction. Read otherwise, his comments would make little sense, for they would suggest that a class action could always be brought in federal court notwithstanding any federal law (*e.g.,* Rule 23) barring such an action.

**61.** Fed.R.Civ.P. 23(b)(3) provides:

(b) **Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

.　　.　　.　　.　　.

(3) the court finds that the questions of law or fact common to the members of the class

predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

**62.** 15 U.S.C. § 2301(7) (1982). This definition provision reads:

The term "implied warranty" means an implied warranty arising under State law (as modified by sections 2308 and 2304(a) of this title) in connection with the sale by a supplier of a consumer product.

**63.** *See Walsh,* 106 F.R.D. at 395.

**64.** *Id.* at 404.

rial as to impede a threshold finding that common questions of fact predominated.[65]

■ We hold, as the District Court appeared to recognize in a later chapter of this case,[66] that, except in the specific instances in which Magnuson-Moss expressly prescribes a regulating rule, the Act calls for the application of state written and implied warranty law, not the creation of additional federal law. The District Court, in this clearer light, should reexamine whether "variations in State law prohibit a finding of predomination for common questions of law."[67] Furthermore, in view of the multiple transmission configurations swept into the certifications,[68] we remand the "class-wide proof" issue for closer inspection by the District Court.

The District Court initially demonstrated full appreciation of the inquiry a court must make to determine whether, as Rule 23(b)(3) requires, "questions of law or fact common to members of the [alleged] class predominate."[69] Thus, the trial judge identified as key to the commonality of law determination in this case "the impact of potentially varying State laws," and as critical to the commonality of fact determination "the availability of class-wide proof."[70] Her analysis veered off course, it appears, because she regarded Magnuson-Moss as an Act intended to facilitate nationwide class actions; she therefore thought it necessary to take a "liberal" or "less strict" approach to Rule 23 certifications.[71] We

have already held that Rule 23 applies in Magnuson-Moss cases as it does in federal court cases generally. Had the trial judge felt no Act-prompted pressure to certify, she might not have resisted close analysis of state laws governing the existence, scope, and contours of implied warranties. Furthermore, she might not have assumed that federal law alone governed the alleged written warranty claims. Finally, she might not have proceeded so swiftly to the conclusion that differences in the transmission systems at issue "are either not material or can easily be [handled by establishing] subclasses pursuant to Rule 23(c)(4)."[72]

### 1. The Commonality of Law Determination

Magnuson-Moss, appellees urge, federalizes much of the law governing consumer product warranties; thus common questions of law, they assert, necessarily predominate in this case. Appellees' expansive reading of the Act is not anchored to its text, nor is it securely moored to the legislation's history. The Act, we harbor no doubt, has a far more limited mission. Congress sought only to supplement state warranty law by prescribing certain minimum standards for warrantors, and by affording consumers additional avenues for redress.[73]

---

**65.** *Id.* at 394–95.

**66.** In a separate opinion refusing to certify a punitive damages class, the District Court stated its understanding that the Act "add[ed] a new layer of federal warranty law to existing state warranty doctrines," but for the most part did not supplant state law. *Walsh v. Ford Motor Co.,* 627 F.Supp. 1519, 1525 (D.D.C.1986) (quoting Schroeder, *Private Actions under the Magnuson-Moss Warranty Act,* 66 CALIF.L.REV. 1, 35 (1978)). *See* note 13 *supra.*

**67.** *Walsh,* 106 F.R.D. at 395.

**68.** The parties apparently agree that at least 20 transmission configurations are involved; their dispute concerns the materiality of the differences among these configurations. Brief of Appellees at 20.

**69.** *See Walsh,* 106 F.R.D. at 392–93.

**70.** *Id.* at 393.

**71.** *See id.* at 386–87.

**72.** *Id.* at 395. FED.R.CIV.P. 23(c)(4) provides:
When appropriate (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly.
*See also* FED.R.CIV.P. 23(c)(1) (class action order may be altered or amended before the decision on the merits).

**73.** Congress sought particularly to encourage warrantors to avoid litigation by establishing informal mechanisms for the fair and expeditious resolution of consumer disputes. *See* 15 U.S.C. § 2310(a) (1982) (informal dispute settlement procedures).

The Act provides for civil actions by consumers in state courts or, if specified jurisdictional amount requirements are met (each individual claim, at least $25; all claims in suit, at least $50,000), in federal district courts; courts may award prevailing plaintiffs in such actions costs and expenses, including attorneys' fees.[74] The action Magnuson-Moss authorizes may be instituted for recovery from "a supplier, warrantor, or service contractor" who has failed "to comply with any obligation under this chapter, *or* under a written warranty, implied warranty, or service contract."[75]

Had Congress intended Magnuson-Moss to substitute federal for state law as the dominant regulator of consumer product warranties under the Act, the alternative references just quoted would be anomalous. An "obligation under this chapter" derives, of course, from the federal Act. The further, separate reference to obligations under written and implied warranties strongly suggests that Congress contemplated the coexistence of another source of regulating rules in the actions authorized by section 110(d), a source outside the federal Act, *i.e.*, state law.[76]

Tellingly, the $50,000 amount-in-controversy threshold for federal court jurisdiction stated in section 110(d)(3) confines the mine-run of Magnuson-Moss consumer civil actions to state courts.[77] A responsible Congress would not, without offering rhyme or reason, place the laboring oar in developing a corpus of federal consumer product warranty law in the hands of over fifty diverse, non-federal court systems.[78]

We state further below why we think it beyond genuine dispute that, as to both implied and written warranties, Congress intended the application of state law, except as expressly modified by Magnuson-

---

**74.** 15 U.S.C. § 2310(d) (1982). This section provides:

> (d) **Civil action by consumer for damages, etc.; jurisdiction; recovery of costs and expenses; cognizable claims**
>
> (1) Subject to subsections (a)(3) and (e) of this section, a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief—
>
> (A) in any court of competent jurisdiction in any State or the District of Columbia; or
>
> (B) in an appropriate district court of the United States, subject to paragraph (3) of this subsection.
>
> (2) If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably incurred by the plaintiff for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.
>
> (3) No claim shall be cognizable in a suit brought under paragraph (1)(B) of this subsection—
>
> (A) if the amount in controversy of any individual claim is less than the sum or value of $25;

> (B) if the amount in controversy is less than the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit; or
>
> (C) if the action is brought as a class action, and the number of named plaintiffs is less than one hundred.

**75.** *Id.* § 2310(d)(1) (emphasis added).

**76.** Federal common law should not supply the regulating rules, for the application of state law here is not inconsistent with federal interests. *See Texas Indus., Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 640–42, 101 S.Ct. 2061, 2066–68, 68 L.Ed.2d 500 (1981) (federal common law comes into play when there is a uniquely federal interest in need of protection or when Congress has clearly signalled its intent that the courts develop federal substantive law). *See generally* Field, *Sources of Law: The Scope of Federal Common Law,* 99 HARV.L.REV. 881 (1986).

**77.** The $50,000 threshold is not easily crossed because the Act itself does not impose liability on warrantors for personal injuries or consequential damages, and many states permit these liabilities to be disclaimed. *See* U.C.C. § 2–715 (1978). *Cf.* S.REP. No. 151, 93d Cong., 1st Sess. 23 (1973); H.REP. No. 1107, 93d Cong., 2d Sess. 42 (1974), *reprinted in* 1974 U.S.CODE CONG. & ADMIN.NEWS 7702, 7724.

**78.** The Act applies to all fifty states, the District of Columbia, Puerto Rico, the Virgin Islands, Guam, the Canal Zone and American Samoa. *See* 15 U.S.C. § 2301(15) (1982).

Moss, in section 110(d) breach of warranty actions.

a. *Implied Warranty.* The Act, in section 101(7) (set out note 62 *supra*), defines "implied warranty" by explicit reference to state law as modified by federal standards detailed in sections 108 and 104(a).[79] There

is nothing obscure about the interplay Congress ordered: state law creates the warranty[80] and also governs its dimensions, except as otherwise prescribed with particularity in Magnuson-Moss itself. The Federal prescriptions apply as written; where the Act states no prescription, state law continues in force.[81]

**79.** These sections, 15 U.S.C. §§ 2304(a) & 2308 (1982), provide:

§ **2304. Federal minimum standards for warranties**

**(a) Remedies under written warranty; duration of implied warranty; exclusion or limitation on consequential damages for breach of written or implied warranty; election of refund or replacement**

In order for a warrantor warranting a consumer product by means of a written warranty to meet the Federal minimum standards for warranty—

(1) such warrantor must as a minimum remedy such consumer product within a reasonable time and without charge, in the case of a defect, malfunction, or failure to conform with such written warranty;

(2) notwithstanding section 2308(b) of this title, such warrantor may not impose any limitation on the duration of any implied warranty on the product;

(3) such warrantor may not exclude or limit consequential damages for breach of any written or implied warranty on such product, unless such exclusion or limitation conspicuously appears on the face of the warranty; and

(4) if the product (or a component part thereof) contains a defect or malfunction after a reasonable number of attempts by the warrantor to remedy defects or malfunctions in such product, such warrantor must permit the consumer to select either a refund for, or replacement without charge of, such product or part (as the case may be). The Commission may by rule specify for purposes of this paragraph, what constitutes a reasonable number of attempts to remedy particular kinds of defects or malfunctions under different circumstances. If the warrantor replaces a component part of a consumer product, such replacement shall include installing the part in the product without charge.

. . . .

§ **2308. Implied Warranties**

**(a) Restrictions on disclaimers or modifications**

No supplier may disclaim or modify (except as provided in subsection (b) of this section) any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer product, or (2) at the time of sale, or within 90 days thereafter, such supplier enters into a

service contract with the consumer which applies to such consumer product.

**(b) Limitation on duration**

For purposes of this chapter (other than section 2304(a)(2) of this title), implied warranties may be limited in duration to the duration of a written warranty of reasonable duration, if such limitation is conscionable and is set forth in clear and unmistakable language and prominently displayed on the face of the warranty.

**(c) Effectiveness of disclaimers, modifications, or limitations**

A disclaimer, modification, or limitation made in violation of this section shall be ineffective for purposes of this chapter and State law.

**80.** *See* S.Rep.No. 151, 93d Cong., 1st Sess. 21 (1973) ("It is not the intent of the Committee to alter in any way the manner in which implied warranties are created under the Uniform Commercial Code. For instance, an implied warranty of fitness ... which might be created by an installing supplier is not, in many instances, enforceable by the consumer against the manufacturing supplier. The Committee does not intend to alter currently existing state law on these subjects.").

**81.** Appellees insistently urge that, apart from the (uniform) Uniform Commercial Code definition of an implied warranty of merchantability, Brief of Appellees at 38, and possibly privity, "the Act itself provides uniform federal standards for every legal issue that might be subject to state law variations." *Id.* at 40. *See also id.* at 44–45 ("Except for the definition of an implied warranty, uniform federal standards apply whether the action is brought in state or federal court."); *id.* at 51 ("content and scope [of affirmative defenses to breach of implied warranty claim] is a matter of uniform *federal* decisional law"). These are indulgences in wishful thinking. *See* note 86 *infra* and accompanying text.

In support of their contentions as to the nearly total governance of uniform federal law, plaintiffs cite statements of Representative Eckhardt in a 1971 Hearing on a predecessor bill. *Hearings Before the Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce,* 92d Cong., 1st Sess. 390–93 (1971). The statements are not crystal-

b. *Written Warranty.* The Act, in section 101(6), sets out a self-contained definition of "written warranty"; in contrast to the subsection defining "implied warranty" (section 101(7), set out note 62 *supra*), the written warranty definition does not refer to state law.[82] An argument that Magnuson-Moss federalizes written warranty law therefore has surface plausibility.

One need not search far, however, to comprehend why the Act presents its own definition of written warranty. State law distinguishes "express" warranties from "implied" ones. "Express warranty" is defined in state law; the term encompasses both written and oral undertakings.[83] Congress ultimately decided that oral warranties need not be covered in the federal legislation unless and until they become "more prevalent." [84] Because the state law term "express warranty" did not suit the limited federal purpose, Congress supplied a definition—one confined to "written warranty"—that did.

But Congress indicated that, as in the case of implied warranties, state law would guide the determination whether a written warranty had been created. Magnuson-Moss, in section 101(6), defines "written warranty" as "any written affirmation of fact or written promise made in connection with the sale of a consumer product...." The Conference Report to S. 356, the bill that became the Act, explains:

line. They include something for each side. Indeed, Ford cites lines from Rep. Eckhardt to the effect that, as in diversity cases, state law looms large in Magnuson-Moss consumer actions for breach of warranty. *Compare* Brief of Appellees at 42–43 *with* Brief of Appellant at 40–41. These murky and inconsistent statements, we are satisfied, are not entitled to heavy weight. *See Castaneda-Gonzalez v. Immigration and Natur. Serv.*, 564 F.2d 417, 424 (D.C.Cir. 1977); *March v. United States*, 506 F.2d 1306, 1314 & nn. 31–32 (D.C.Cir.1974).

**82.** This definition section, 15 U.S.C. § 2301(6) (1982), provides:

(6) The term "written warranty" means—

(A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or

(B) any undertaking in writing in connection with the state by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking,

which written affirmation, promise, or undertaking becomes part of the basis of the bargaining between a supplier and a buyer for purposes other than resale of such product.

**83.** *See* U.C.C. § 2–313 (1972), which states:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

**84.** Both the Senate and House, in their pre-enactment (S. 356) versions of the consumer civil action for breach of warranty, had authorized attorneys' fees for successful plaintiffs. The versions differed in one material respect; while the House permitted suits only for written and implied warranties, the Senate permitted suits for express and implied warranties. When the two versions were reconciled, the Senate's coverage of oral warranties was eliminated with this explanation:

The Senate bill afforded reasonable attorney's fees to a consumer who successfully sued for the breach of an express oral warranty. The House amendment did not provide reasonable attorney's fees in that situation. The conferees adopted the House approach, but stated that they would reexamine the issue if oral express warranties became more prevalent.

S.CONF.REP. No. 1408, 93d Cong., 2d Sess. 26 (1974), *reprinted in* 1974 U.S.CODE CONG. & ADMIN. NEWS 7702, 7758.

The conferees intend that, if under State law a warrantor or other person is deemed to have made a written affirmation of fact, promise, or undertaking he would be treated for purposes of [the Act's consumer remedies section, section 110] as having made such affirmation of fact, promise, or undertaking.[85]

Here too, if Congress intended displacement of state law beyond the Act's explicit prescriptions, one would expect to find a clear statement to that effect.[86] Particularly in an area traditionally in the state's domain, such as sales law, the likelihood is that the national legislature, when it intervenes, and does not say otherwise, opts for the little rather than the much. We have no reason to believe Congress departed from that general pattern in this particular instance.

Having determined that state warranty law lies at the base of all warranty claims under Magnuson-Moss, we next state our reasons for instructing the District Court to reconsider the finding that common legal questions predominate in each class certified.

c. *The District Court Finding.* The District Court recognized the controlling role of state law on two issues. First, the trial judge looked to the law of the state of purchase to exclude from class certification purchasers from states in which vertical privity between manufacturer and purchaser is necessary to give rise to an implied

warranty.[87] Later, the trial judge held that state law determined the availability of punitive damages; on that account, the judge refused to certify a punitive damages class.[88] The District Court declined, however, to inquire further into the existence and character of differences in state warranty laws. Regarding the written warranty claims, the judge apparently believed all relevant law was federal. As to the implied warranty claims, she explained: "To conclude that a court must look to the many States, with their varying judicial interpretations of what constitutes breach of implied warranty, would make it virtually impossible to apply the Act in multi-State class actions for Magnuson-Moss breach of implied warranty claims."[89] While refusing to consider the application of "varying State laws for breach of implied warranty," the trial judge deferred for consideration on another day "the question of which law shall apply."[90]

Appellees see the "which law" matter as academic. They say no variations in state warranty laws relevant to this case exist.[91] A court cannot accept such an assertion "on faith." Appellees, as class action proponents, must show that it is accurate.[92] We have made no inquiry of our own on this score and, for the current purpose, simply note the general, unstartling statement made in a leading treatise: "The Uniform Commercial Code is not uniform."[93]

---

**85.** *Id.* at 26, *reprinted in* 1974 U.S.Code Cong. & Admin.News at 7759.

**86.** *Cf.* note 81 *supra.* We are mindful that "[i]f judges readily created federal common law whenever they spotted a gap in federal statutory or constitutional directives, those actions would threaten the classic view of federal law as largely interstitial; there would be much less room in which state law could operate, and the importance of state law would diminish accordingly." Field, *supra* note 76, at 931.

**87.** *Walsh,* 106 F.R.D. at 395. *See* note 10 *supra.*

**88.** *See* notes 13 and 66 *supra.*

**89.** *Walsh,* 106 F.R.D. at 395.

**90.** *Id.* at 396 & n. 12. The judge did not say whether she had in mind applying the law of

one particular state to all members of the nationwide class. *Cf. Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 2980, 86 L.Ed.2d 628 (1985) (application of Kansas law to all claimants in nationwide class action would be "arbitrary and unfair" absent showing that Kansas had a significant relationship to each class member's claim).

**91.** Brief of Appellees at 45–51.

**92.** *See, e.g., Horton v. Goose Creek Ind. School Dist.,* 677 F.2d 471, 490 (5th Cir.1982), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983).

**93.** J. White & R. Summers, Uniform Commercial Code 7 (2d ed. 1980).

■ The governance of state law does not inevitably mean that "no multi-State class action for breach of implied [or written] warranty under the Act could ever be possible." [94] A considered predomination determination by the District Court, however, must be made. [95] As the Third Circuit observed in *In re Asbestos School Litigation*, [96] to establish commonality of the applicable law, nationwide class action movants must creditably demonstrate, through an "extensive analysis" of state law variances, "that class certification does not present insuperable obstacles." [97] As appellees themselves at one point accurately observed: "The issue can only be resolved by first specifically identifying the applicable state law variations and then determining whether such variations can be effectively managed through creation of a small number of subclasses grouping the states that have similar legal doctrines." [98]

Citing decisions of sister courts, appellees urge that nationwide class actions may be maintained even when state law variations are marked. The decisions cited, however, invariably involved lawsuits in which "the evidence in each case [on major factual questions] was either identical or virtually so." [99] These cases would be relevant, therefore, only if appellees proffered strong indications that major factual issues in each class member's claim in this lawsuit are "identical or virtually so." We thus reach the commonality of fact issue this case presents.

### 2. The Commonality of Fact Determination

The trial judge expressed concern "whether there are material differences between the four transmissions at issue which would prevent the presentation of class-wide proof." [100] She observed, however, that if material differences became apparent, she could, at a later stage, "separate each transmission type into a subclass." [101] She did not home in on Ford's argument, backed by the affidavits of experts, [102] that the class certifications at issue in fact encompassed at least twenty materially different transmission control systems. [103]

■ Appellees have not identified in support of the alleged breach of warranty claims, and we have not found in the record, any indications of evidence *common to all the transmission configurations* swept into the class definition. Class action proponents may not be called upon to prove their case in order to obtain certifi-

---

94. *Walsh*, 106 F.R.D. at 395.

95. *Cf. General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160–61, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982) (court of appeals judgment affirming class action certification reversed where court of first instance did not engage in rigorous analysis).

96. 789 F.2d 996 (3d Cir.1986), *aff'g* 104 F.R.D. 422 (E.D.Pa.1984), *cert. denied*, — U.S. —, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986).

97. *Id.* at 1010. We set out below more completely the Third Circuit's statement in *Asbestos* upholding the District Court's Rule 23(b)(3) certification:
> To meet the problem of diversity in applicable state law, class plaintiffs have undertaken an extensive analysis of the variances in products liability among the jurisdictions. That review separates the law into four categories. Even assuming additional permutations and combinations, plaintiffs have made a credita-

ble showing, which apparently satisfied the district court, that class certification does not present insuperable obstacles. · 789 F.2d at 1010.

98. Brief of Appellees at 45–46.

99. *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 470 (5th Cir.1986); *see also Deadwyler v. Volkswagen of America, Inc.*, No. ST–85–38 (W.D.N.C. Apr. 7, 1986) [Available on WESTLAW, DCTU database] (implied warranty claims involving common defect in a common product).

100. *Walsh*, 106 F.R.D. at 394.

101. *Id.; see note 72 supra.*

102. R.E. Tabs 11, 12.

103. The trial judge thought four subclasses might be manageable, *see Walsh*, 106 F.R.D. at 394; she did not speak to the prospect of twenty subclasses.

cation.[104] However, appellees must tender some creditable basis for claiming that "differences in design among [Ford's approximately 20] systems are minor and immaterial." [105]

On appeal, appellees offered a definite statement regarding fact commonality. Ford's transmission system design variations "tend to cancel each other out," appellees assert, so that "the designs all remain in the same defect class." [106] Standing alone, this assertion is Delphic, but appellees immediately explain: "all of [Ford's] design variations are minor in relation to the overriding common defect of lack of automatic self-centering." [107] This defect, appellees maintain, is common to every Ford transmission system at issue. It is the defect, appellees say, that permits cars to "jump into reverse." [108]

Because appellees now assign prime place to the alleged common defect called "lack of automatic self-centering," we inspect that ground for claiming a predominating common question of fact. A transmission suffers from "lack of automatic self-centering," appellees state, if it will not immediately adjust itself into a gear when the driver leaves the control lever in a position between gears. Appellees' expert, Simon Tamny, has sworn that this alleged defect is due primarily to a rounded or flat, rather than sharp, tooth between the reverse and park positions on the transmission "roostercomb." [109] The evidence

appears beyond dispute, however, that the roostercombs of numerous other automobiles (including most, if not all, cars of Ford's domestic competitors and many foreign luxury automobiles) were at least as dull as the Ford roostercombs.[110]

Thus, Ford's unsharp roostercombs cannot carry the day for appellees. If Ford transmissions engaged in park-to-reverse more frequently than other automobile transmissions, then something in addition to the roostercomb tooth contour must have brought about the defect. That something else has not been identified as common to all Ford transmission configurations at issue. So far as we can tell from the current record, the unsharp roostercomb theory still leaves the appellees with the need to show that each configuration had special characteristics which, singularly or in combination, caused lack of automatic self-centering. Before reaching a common fact predominance determination under Rule 23(b)(3), the District Court should have inquired further in order to estimate how varied (configuration-specific) the transmission design defect proof would likely be.

## III. CONCLUSION

In finding that individual notice to each potential class member was unnecessary, and that common questions of law or fact predominated, the District Court was swayed by the view, which we have found

**104.** *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974).

**105.** *See* Brief of Appellees at 63–64.

**106.** *Id.* at 64.

**107.** *Id.* The full statement in the brief reads: [D]ifferences in design among the systems are minor and immaterial. In fact, the examples given by Ford enable as [sic] to demonstrate this. (Ford Br. at 64–66.) Thus, the relative ratchet and detent spring forces in the C–4 that tend to return the manual valve to reverse rather than holding it in park is counterbalanced by the greater shift effort required

to place the C–6 in park, since the C–6 lacks the C–4's additional deficiency. The single rod linkage is more sensitive to engine vibration, but the cable rod is more sensitive to friction. In short, because these design variations tend to cancel each other out, the designs all remain in the same defect class. This is because all of these design variations are minor in relation to the overriding common defect of lack of automatic self-centering.
*Id.* at 63–64 (footnote omitted).

**108.** *Id.* at 4, 9.

**109.** R.E. Tabs 16, 20.

**110.** R.E. Tabs 12, 25.

incorrect, that Congress sought to facilitate nationwide class actions under Magnuson-Moss, and therefore expected an indulgent approach by judges to Rule 23(b)(3) certifications.[111] Having clarified that Rule 23 applies in Magnuson-Moss cases as it does in federal litigation generally, *i.e.*, sensibly but without special dispensations, we return the case to the District Court with no prejudgment as to the outcome of a renewed predominance inquiry.[112]

For further proceedings consistent herewith, the decision of the District Court certifying classes in this litigation is

*Vacated and remanded.*

**111.** We do not reach appellees' argument that the District Court erred in rejecting their alternatively proposed Rule 23(b)(2) declaratory and equitable (recall/retrofit) relief class. We note, however, that manageability problems that might block a class action under Rule 23(b)(3) may be entailed as well in the Rule 23(b)(2) format. We note, too, that the Department of Transportation, when it declined to continue an investigation against Ford for the very defect alleged by appellees here, determined that injunctive relief similar to that which appellees requested in the District Court was inappropriate. *See Center for Auto Safety, Inc. v. Lewis,* 685 F.2d 656 (D.C.Cir.1982).

**112.** The District Court recognized that, with respect to the two classes seeking to pursue property damage claims based on specific park-to-reverse incidents, potentially individual issues were present "such as causation, affirmative defenses, and damages." *Walsh,* 106 F.R.D. at 399. Such issues, the trial judge observed and we agree, are not necessarily dispositive against certification. "The Court [can] certify a strictly limited group of issues, establish various subclasses, or address the common issue on a class-wide basis and manage the individual issues ... at the conclusion of the class-wide trial." *Id.* *See Joseph v. General Motors Corp.,* 109 F.R.D. 635, 642 (D.Colo.1986) (certifying a state-wide Magnuson-Moss class because individual questions of causation "can be resolved in separate proceedings").