Ronald CLAUSNITZER, et al., Plaintiffs,

v.

**FEDERAL EXPRESS CORPORATION,** Defendant.

No. 06–21457–CIV.

United States District Court, S.D. Florida, Miami Division.

Feb. 28, 2008.

Andre E. Jardini, Gwen Freeman, Knapp Petersen & Clarke, Michael S. Duberchin, Glendale, CA, Glen Robert Bregman, Encino, CA, Marshall Dore Louis, Sinclair Louis Heath Nussbaum & Zavertnik, Miami, FL, for Plaintiffs.

Aaron Jarett Reed, Littler Mendelson, Miami, FL, Richard S. McConnell, Jr., Sandra C. Isom, Federal Express Corporation, Legal Department, Memphis, TN, for Defendant.

## ORDER ON MOTION FOR CLASS CERTIFICATION

CECILIA M. ALTONAGA, District Judge.

**THIS CAUSE** came before the Court for hearing on January 17, 2008, upon Plaintiffs' Motion for Class Certification ("Motion") [D.E. 56–1]. Plaintiffs move for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure. The undersigned has carefully considered the parties' written submissions, oral arguments by counsel, and pertinent portions of the record, and is persuaded that this case is not appropriate for class treatment.

### I. BACKGROUND

#### A. Plaintiffs' Claims

Plaintiffs, a group of hourly employees of Federal Express Corporation ("FedEx"), brought the instant action against FedEx alleging the company engaged in a pervasive and long-standing policy of failing to pay hourly employees for all time worked. (See Amend. Compl. [D.E. 30] at ¶ 42). Plaintiffs style their suit as a class action and purport to represent a class of individuals consisting of hourly, non-exempt FedEx employees employed in every state and the District of Columbia, with the exclusion of California.[1] (See id. at ¶ 23). The proposed class

---

1. More specifically, Plaintiffs' proposed class includes "[a]ll employees of FedEx in the DGO and AGFS Divisions ... [which] includes couriers, courier/handlers and service agents, and any oth- er non-exempt employee who is, or was, required during the class period to punch in and out on a manual time clock, but was paid only from

includes all such employees whose claims are not barred by the applicable statutes of limitations. (*See id.*).

Plaintiffs allege two causes of action: (1) breach of contract for non-payment of wages owed; and (2) a claim in *quantum meruit* for services rendered. (*See id.* at ¶¶ 48–60). Class certification is sought only with respect to the claim for breach of contract. (*See Transcript of Jan. 17 Oral Argument ("Oral Argument")* [D.E. 73] at 23–25). According to Plaintiffs, FedEx breached its contractual obligation to compensate them by failing to pay for three categories of time worked: (1) time worked between arriving at a FedEx facility and the scheduled start time; (2) time worked between the scheduled stop time and leaving a FedEx facility; and (3) time worked during unpaid breaks. (*See Amend. Compl.* at ¶ 28; *Motion* at 3).

**B. *The Factual Record Developed for Class Certification***

*1. Employment Relationship Between Plaintiffs and FedEx*

Plaintiffs assert that the employment relationship existing between the parties arises from an express contract. (*See Amend. Compl.* at ¶ 49; *Motion* at 3; *Reply in Support of Motion for Class Certification ("Reply")* [D.E. 66–1] at 2–3). They claim the contract is embodied in several documents, including a signed employment agreement and a FedEx employment manual.

Each potential member of the class signed an employment agreement upon beginning the employment application process with FedEx. (*See, e.g., Employment Agreements, Affidavit of Andre E. Jardini ("Jardini Aff.")* Exh. 48 [D.E. 56–26] ). The main purpose of these agreements was to protect FedEx during the process of vetting potential employees. (*See id.*). Every employment agreement contains a clause specifying that the nature of the employment relationship between FedEx and the employee is at-will. (*See id.* at 626–41). There were a number of different versions of the employment agreement signed by employees over the years; most material terms were consis-

tent, but some agreements included provisions regarding alternative dispute resolution procedures and a clause specifying a 6–month limitations period on filing suit. (*See id.* at 626, 628–29).

FedEx also provided employees copies, or gave them access to, various company employment manuals, including an "Employment Handbook" and a "People Manual." Both the Employment Handbook and the People Manual explicitly disclaim that their respective terms create contractual rights. (*See Jardini Aff.* Exh. 47 [D.E. 56–24] at 576; *Declaration of Leila Hassan ("Hassan Decl.")* Exh. 3 [D.E. 61–3] ). Employees also signed a receipt accompanying the Employee Handbook acknowledging that the Handbook does not create a contract. (*See, e.g., Exh. 5 to Clausnitzer Dep., Hassan Decl.* Exh. 18 [D.E. 61–6] ). Section 3–92 of both the Employee Handbook and the People Manual states, "[i]t is the policy of FedEx Express to compensate employees for all time worked in accordance with applicable state and federal laws." (*See Jardini Aff.* Exh. 47 at 591, Exh. 55 [D.E. 56–29] at 743). In the People Manual, the following sentence states, "[e]xcept for certain approved preliminary and postliminary activities, no employee should perform work 'off the clock' for any reason, whether on their own initiative or at the request of management." (*See Jardini Aff.* Exh. 55 at 743).

In their Motion, Plaintiffs assert their relationship with FedEx is governed by "a written employment contract, consisting of the written employment application ... and the FedEx Employee Handbook." (*Motion* at 3). In their Reply, however, Plaintiffs apparently abandon the notion that the Employee Handbook is the operative embodiment of the alleged contracts, and instead assert that the People Manual creates the contractual obligation. (*See Reply* at 3). In support of the alleged obligation, Plaintiffs point to the deposition of FedEx employee Paula Presnopolus in which she testified that "[t]he policy clearly states that FedEx will compensate employees for time worked." (*Jardini Aff.* Exh. 63 [D.E. 66–8] at 886–87). Plaintiff's assert FedEx breached Section 3–92 of the

scheduled start time to scheduled end time."

(*See Motion* at 2).

People Manual by failing to pay for all time worked. Plaintiffs argue their claim is viable under the contract law of the fifty jurisdictions covered by their proposed class, because to the extent necessary for them to establish their claim, the law is essentially the same.[2] (*See Motion* at 5–6; *Reply* at 9).

FedEx disputes that an express contractual relationship between it and the Plaintiff employees exists. (*See Memo. in Opposition ("Opposition")* [D.E. 61–1] at 3–4). Instead, FedEx maintains that Plaintiffs are employed at-will, and the employment agreements and provisions of the Employee Handbook and People Manual relied on by Plaintiffs do not create contractually enforceable obligations. (*See id.*). The company also argues that the contract law of the covered jurisdictions includes many important distinctions resulting in individual inquiries that will swamp the adjudication of this case as a class action. (*See id.* at 7–9).

### 2. *FedEx's Monitoring of Employees' Time*

Plaintiffs' ability to show the viability of their claim hinges on evidence produced from FedEx's systems of recording employees' time. FedEx maintained two primary systems for tracking employees' activities and documenting time.[3] (*See Motion* at 3; *Opposition* at 2–3). First, FedEx recorded time electronically by requiring employees to use electronic devices known as Trackers, Super-Trackers, and PowerPads (collectively "Tracker[s]"). (*See Opposition* at 2). During the day or at the end of the day, employees manually entered task codes into the Tracker to correspond to activities performed at a given time. (*See id; Decl. of R.*

*Carlson, Hassan Decl.* Exh. 11 [D.E. 61–5] at ¶¶ 6–7). These manually entered work codes documented when the employee began work, started and finished a break, and ended work for the day. (*See id.*). The information was later transmitted to the FedEx employee time database ("FAMIS") and used by the payroll department to process paychecks. (*See id.*).

Because employees controlled the manual entry of work codes into the Tracker and because these entries were not automatically time stamped, FedEx states that the data contained in the FAMIS system did not always accurately reflect a particular employee's activities at a specific moment during the day.[4] (*See Opposition* at 3 n. 5, 17; *Oral Argument* at 48–49). Trackers were also used by employees to record stops and scan packages at pick-ups and deliveries. FedEx compiled the data to improve the efficiency of deliveries, track packages, and ensure that customers received packages on schedule. (*See Motion* at 9; *Opposition* at 2).

The second method of controlling employees' time was through a traditional punch clock system. (*See Motion* at 9; *Opposition* at 3). FedEx required employees to punch a card through a time clock when arriving at the FedEx facility and when leaving the facility at the end of the work day. (*See id*). Employees sometimes arrived at the FedEx facility and punched their cards before the scheduled start time, and likewise left the facility and punched the cards after their scheduled end time.[5] (*See Motion* at 3; *Opposition* at 3). Employees were only compensated, however, for the time between the scheduled starting and ending times, which

---

**2.** Plaintiffs have submitted a compendium of state laws summarizing the contract law of each jurisdiction. (*See Compendium of State Laws* [D.E. 56–6—56–14]). They contend that each jurisdiction accepts the basic contract principles defining a breach of contract as contained in the Restatement (Second) of Contracts.

**3.** The parties also mention a third manner of tracking time that involved employees writing task codes on time sheets and/or printing the electronic records and affixing them to the time sheets. (*See Motion* at 9; *Jardini Aff.* [D.E. 56–2] at ¶¶ 43–47).

**4.** According to FedEx, a study conducted by its engineers found that over 40% of all break codes were entered by employees after the employee actually took the break, although this practice was discouraged. (*See Dep. of S. Healy, Hassan Decl.* Exh. 36 [D.E. 61–9] at 93).

**5.** Subsequent to the initiation of litigation regarding the facts underlying Plaintiffs' claims, FedEx implemented a policy requiring employees to punch their cards within five minutes of beginning and ending their shifts instead of when arriving and leaving the FedEx facility. (*See Jardini Aff.* at ¶ 219; *Oral Argument* at 51).

did not necessarily coincide with the manual punch-in and punch-out times. (*See Motion* at 3).

### 3. *Work Occurring During Gap Periods*

According to Plaintiffs, it was FedEx's corporate policy that employees were required to perform certain work functions during the "gap periods" between punching in and the scheduled start time, and between the scheduled end time and punching out for the day. (*See id.*). Thus, Plaintiffs assert that employees were required to perform work during time periods when they were not being paid. (*See id.; Jardini Aff.* at ¶¶ 53, 57 (citing declarations and depositions)). The activities allegedly performed during these unpaid periods vary according to the job function of the particular employee and include gathering equipment and supplies, finishing paperwork, and completing closing procedures. (*See Motion* at 9–10). Plaintiffs offer their own declarations and depositions and the deposition testimony of other employees for the proposition that work was performed during these gap periods. (*See Jardini Aff* Exh. 1–6 [D.E. 56–15]; *Jardini Aff* at ¶¶ 53, 57 (citing declarations and depositions)).

For example, Plaintiff, Ronald Clausnitzer, is employed as a courier, and he stated that during the beginning of shift gap periods he gathered equipment and prepared to work on his route. (*See Decl. of R. Clausnitzer, Jardini Aff.* Exh. 1 [D.E. 56–15] at ¶ 7). According to Clausnitzer, during the end of a day gap period, "additional day's end duties were frequently performed." (*Id.* at ¶ 10). Service agent Dawn Robertson stated that in the fifteen minutes between punching in and her scheduled start time, she typically "set up the service center ... reviewed hold packages ... [and got] the bags ready." (*Decl. of D. Robertson, Jardini Aff.* Exh. 35 [D.E. 56–22] at ¶ 4). Robertson was "told to finish the day's end duties on [her] own time, therefore unpaid." (*Id.* at ¶ 2).

Plaintiffs have also submitted the affidavits of statistician, Dr. Richard Drogin, who reviewed and analyzed a sample of employee time data obtained from FedEx. (*See Aff. of R. Drogin* ("*Drogin Aff*") [D.E. 56–3]; *Suppl. Aff. of R. Drogin* [D.E. 66–2] ). Dr. Drogin's study compared employee time records from the FAMIS database to the time records recorded by manual punch cards. He found that, on average, each employee's records reflected an 8.1 minute gap period each day. (*See Drogin Aff.* ¶ 6). Plaintiffs claim all gap periods of every class member constitute unpaid work. (*See Motion* at 11).

The record does not contain any evidence of an explicit FedEx policy requiring employees to work during gap periods. To the contrary, FedEx's policies explicitly prohibited employees from performing work off-the-clock. (*See People Manual, Jardini Aff.* Exh. 55 at 743). FedEx states that the punch-in and punch-out times reflected by the manual records have no bearing on the actual time worked by employees. (*See Opposition* at 3). FedEx explains that it was the published policy of the company (understood by employees) that manual punch times did not correspond to the time for which employees would receive compensation. (*See id.* (citing depositions)). The company points to depositions and declarations of employees, including some of the representative Plaintiffs, for the proposition that the gap periods were employees' personal time. (*See id.* at 3, 20–21).

FedEx notes that there were many individualized reasons unrelated to the completion of work why employees may have arrived at the facility before the scheduled start time or left the facility after the scheduled end time. (*See id.* at 3, 20; *Oral Argument* at 50–21). For example, courier Christine DeMartini stated that she sometimes arrived at work early because of "traffic patterns" or depending on when she dropped her child off at school. (*See Decl. of C. DeMartini, Hassan Decl.* Exh. 22 [D.E. 61–7] at ¶ 7). DeMartini stated that during the period between arriving and her scheduled start time she "may use the restroom or otherwise just get ready to start [her] work day," and she did not expect to "be paid for this time because [she was] not working." (*Id.*). Similarly, courier Steve Lake testified that he typically arrived ten minutes before his starting time because he "didn't like to rush." (*Dep. of S. Lake,*

*Hassan Decl.* Exh. 44 [D.E. 61–11] at 24). During that time he would "talk to people and have a cup of coffee and relax." (*Id.*).

Furthermore, FedEx contends, and certain Plaintiffs have confirmed, there was never a requirement that employees arrive early and punch their time cards before the scheduled start time. (*See Opposition* at 3 (citing *Request for Admissions, Hassan Decl.* Exh. 19 [D.E. 61–6] at ¶¶ 44–45)). With respect to the end of day gap periods, FedEx cites to similar individual reasons developed through employees' declarations and depositions. (*See Opposition* at 21). Courier Cesar Oyague stated that during the end of day gap period he "may stop to talk to coworkers" but did not "expect to be paid for this time because [he was] not working." (*Decl. of C. Oyague, Hassan Decl.* Exh. 55 [D.E. 61–12] at ¶ 9).

FedEx's expert, Dr. Michael P. Ward, conducted a study similar to Dr. Drogin's and found that the statistics provided by Dr. Drogin disproportionately reflect the long gap periods of a concentrated group of employees. (*See Opposition* at 17–18; *Decl. of M. Ward* ("*Ward Decl.*"), *Hassan Decl.* Exh. 69C [D.E. 61–16] at ¶¶ 11–13). Regarding beginning of shift gaps, Dr. Ward found that the median gap period of the data sample was 4 minutes, while the average was 9 minutes; and with respect to the end of shift gap period, the median was 0 minutes and the average was 2.7 minutes. (*See Ward Decl.* at ¶¶ 11–12). Dr. Ward concluded that Dr. Drogin's average "is not an informative statistic because it masks the large difference between morning and evening and because it is greatly influenced by a relatively small number of cases where the [gap period] is inexplicably long." (*Id. at* 13).

#### 4. *Work Occurring During Unpaid Breaks*

As mentioned, employees recorded break periods by entering the appropriate task codes into the Tracker device. Until recently, an employee was able to scan packages and enter other codes during the time period when the Tracker was in the break task code. (*See Oral Argument* at 52–53). It was possible for FedEx management to compare a report of break times with a report indicating scans to discover whether employees were scanning packages and making stops during their breaks. (*See Opposition* at 14). FedEx did not regularly undertake this comparison, instead relying on employees to inform managers if it became necessary to work during a break. (*See id.*).

Plaintiffs assert that working during breaks was a regular occurrence at FedEx. (*See Motion* at 3). They state that by comparing the various reports the company was able to discover that employees were working during breaks, and thus FedEx had knowledge of the work, approved it, and permitted it to continue. (*See id.* at 11). Plaintiffs submit declarations and depositions of various employees indicating they regularly worked during breaks. (*See Jardini Aff.* at ¶¶ 150, 152–53, 155–56, 159 (citing declarations and depositions)). To prove the frequency of this work, Plaintiffs again offer the study of Dr. Drogin. (*See Motion* at 2). Dr. Drogin's analysis compared a sample of time records from the FAMIS database with records of package and stop scans and concluded that 17.6% of unpaid breaks were interrupted by scans.[6] (*See id.; Drogin Aff.* at ¶ 7).

FedEx argues that employees were explicitly told not to work during unpaid breaks and cites documentation of this policy. (*See Employee Handbook, Jardini Aff.* Exh. 47 at 591). The company also points to statements of employees and named Plaintiffs indicating they did not work during unpaid breaks and that they understood the company policy prohibited such work. (*See Opposition* at 4–5 (citing depositions of plaintiffs Bost and Ortiz)). For example, Plaintiff Frederick Ortiz testified he did not work during unpaid lunch breaks. (*See Dep. of F. Ortiz, Hassan Decl.* Exh. 54 [D.E. 61–12] at 26). Plaintiff Anthony Bost testified he did not work during breaks out of a concern that he might "get hurt." (*See Dep. of A. Bost, Hassan Decl.* Exh. 9 [D.E. 61–4] at 113–14). He stated, "I

---

**6.** Dr. Drogin states that during the period of his study, 564,428 of 3,202,113 unpaid breaks were interrupted by work activities. (*See Drogin Aff.* at ¶ 7). This is a 17.6% interruption rate.

do it right. When I'm off … I don't do anything." (*Id.*)

With respect to the statistical data, FedEx contends that Dr. Drogin's study fails to take into account several factors that significantly reduce the number of interrupted breaks. (*See Opposition* at 16). Dr. Ward's study yielded a 9.4% interruption rate after excluding interrupting scans occurring in the first and last minute of the break period and also found that the group of employees in the top 10% in terms of frequency of interrupted breaks accounted for 47.7% of all interrupted breaks. (*See Ward Decl.* at ¶¶ 16, 23). Furthermore, Dr. Ward noted that the named Plaintiffs for whom records were analyzed have "nominal rates of scans [during breaks] ranging from 1.3% to 2.4%." (*Opposition* at 17). The records of Plaintiff Ortiz, however, who testified he never worked during breaks, actually show the highest instance of interrupting events among the named Plaintiffs. (*See id.*). FedEx postulates that the FAMIS records could inaccurately reflect the exact times when breaks occurred because employees input break codes into the system at the end of the day and may have inadvertently created an overlap between a scan and break time. (*See id.; Oral Argument* at 57–58).

### 5. Certification of Class in California State Court

A similar lawsuit was filed in California state court in 2002. *See Foster v. FedEx,* Case No. BC 282300 (Cal.Sup.Ct.) ("*Foster*"). The *Foster* case was based on facts essentially identical to those at issue here, and much of the evidence is similar, if not the same. Class counsel in *Foster* represents Plaintiffs in the instant case and repeatedly offers the *Foster* decision to support certification here. The *Foster* plaintiffs asserted claims for (1) nonpayment of wages in violation of the California Labor Code, and (2) violations of the California Unfair Business Practices statute. (*See Foster Compl., Jardini Aff.* Exh. 7 [D.E. 56–15] at ¶¶ 25–43). The court certified a state-wide class of California employees paid on an hourly basis between October 15, 1998 and the current date.[7] (*See Foster Ruling*

on Motion for Class Certification, ("*Foster Ruling*") *Jardini Aff.* Exh. 8 [D.E. 56–15]).

While the California court's decision to certify in *Foster* is not irrelevant to the class certification analysis here, there are important and countervailing distinctions between *Foster* and the instant case. The claims in *Foster* arose under the wage and hour and unfair practices laws of California, whereas here, Plaintiffs assert their claim under the contract law of fifty separate jurisdictions. Thus, in *Foster* there was no danger of individual inquiries into the law of multiple jurisdictions overshadowing common questions.

There were also relevant facts pertinent to the claims relied on by the court in *Foster* that are inapposite to Plaintiffs' claims in this case. Specifically, the *Foster* court appears to have based its finding of commonality, in part, on evidence that FedEx managers altered employees' time records: "If a trier of fact determines that [FedEx] arbitrarily deducted time and/or altered the FAMIS to insert unpaid breaks then liability to one employee would also apply to every employee within the class. Whether or not the employee was actually damages [sic] would be an individual issue." (*Foster Ruling* at 10). Plaintiffs have not alleged that FedEx intentionally altered time records. Even if they had, the undersigned is not persuaded by the *Foster* court's expansive view of commonality and its willingness to consider individual damages issues for a class consisting of thousands of members based on an alleged violation as to only one member.

## II. CLASS CERTIFICATION ANALYSIS

"Questions concerning class certification are left to the sound discretion of the district court," *Cooper v. Southern Co.,* 390 F.3d 695, 711 (11th Cir.2004) (citing *Armstrong v. Martin Marietta Corp.,* 138 F.3d 1374, 1386 (11th Cir.1998)). With this "great power comes great responsibility; the awesome power of a district court must be 'exercised within the framework of [Federal Rule of Civil Procedure] 23.'" *Klay v. Humana, Inc.,* 382 F.3d 1241, 1251 (11th Cir.2004) (quoting *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 740 (5th Cir.1996)).

---

7. The *Foster* court also certified a subclass not   relevant for purposes of this Order.

A plaintiff seeking certification of a claim for class treatment must propose an adequately defined class that satisfies the requirements of Rule 23, Federal Rules of Civil Procedure. These requirements are frequently denominated " 'the prerequisites of numerosity, commonality, typicality and adequacy of representation,' and they are designed to limit class claims to those 'fairly encompassed' by the named plaintiffs' individual claims." *Piazza v. Ebsco Indus., Inc.,* 273 F.3d 1341, 1346 (11th Cir.2001) (quoting *Gen. Tel. Co. of S.W. v. Falcon,* 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740(1982)). Rule 23(a) provides that class certification is only appropriate where:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims and defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The plaintiff class must also satisfy one of the three additional requirements of Rule 23(b). "For a district court to certify a class action, the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as at least one of the requirements set forth in Rule 23(b)." *Klay,* 382 F.3d at 1250. Plaintiffs assert that the proposed class is certifiable under either Rule 23(b)(1) or 23(b)(3). (*See Motion* at 14). Under Rule 23(b)(1), the court may certify if "prosecuting separate actions ... would create a risk of inconsistent or varying adjudications ... that would establish incompatible standards of conduct for the party opposing the class." Fed.R.Civ.P. 23(b)(1)(A). The final type of sustainable class requires the court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual

members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

In examining whether the party seeking certification has met the requirements of Rule 23, the court should not consider the merits of the proponents' claims. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732(1974). The Eleventh Circuit, however, has counseled that this principle is not to be applied blindly so as "to artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met [the] burden of establishing each of the Rule 23 class action requirements." *Love v. Turlington,* 733 F.2d 1562, 1564 (11th Cir.1984).

Upon initial review of Plaintiffs' allegations, class certification does not appear an unreasonable proposition. However, after conducting the rigorous analysis required by Rule 23, it is apparent that Plaintiffs' proposed class is not adequately defined. Furthermore, common questions among class members do not predominate because (1) Plaintiffs' sweeping nationwide breach of contract claim is overly simplistic and fails to account for a variety of legal issues that must be addressed in determining the nature and terms of the alleged contracts between FedEx and plaintiff employees in the various covered jurisdictions; and (2) class treatment would gloss over countless individual inquiries necessary to properly adjudicate whether work was actually being performed during gap periods and unpaid breaks.

### A. Plaintiffs fail to adequately define the class.

Before engaging in the analysis required by Rule 23, the question of whether the class has been adequately defined should be considered.[8] *See O'Neill v. The Home*

---

8. While some courts have evaluated the adequacy of class definition as part of the numerosity analysis of Rule 23(a)(1), *see In re Polypropylene Carpet Antitrust Litig.,* 178 F.R.D. 603, 612 (N.D.Ga.1997) (citing *Earnest v. General Motors Corp.,* 923 F.Supp. 1469, 1473 & n. 4 (N.D.Ala. 1996)), others examine the question separately, before engaging in the Rule 23 analysis. *See Buford v. H & R Block, Inc.,* 168 F.R.D. 340, 346

(S.D.Ga.1996) (citing *DeBremaecker v. Short,* 433 F.2d 733, 734 (5th Cir.1970)). Irrespective of the manner in which the question is reached, the definition of the class must be accurately delineated in order for the class to be certified. *See Mauldin v. Wal–Mart Stores, Inc.,* No. 01–cv–2755, 2002 WL 2022334, at *8 n. 2 (N.D.Ga. Aug.23, 2002) (citing *DeBremaecker,* 433 F.2d at 734).

*Depot U.S.A. Inc.*, 243 F.R.D. 469, 477 (S.D.Fla.2006) (citing *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262, 269 (S.D.Fla. 2003)). "[A] vague class definition portends significant manageability problems for the court." *Rink v. Cheminova, Inc.*, 203 F.R.D. 648, 660 (M.D.Fla.2001).

In their Motion, Plaintiffs propose a class consisting of "[a]ll employees of FedEx in the DGO and AGFS Divisions, in all states and the District of Columbia, except California, who were paid on an hourly basis." (*Motion* at 2). Plaintiffs propose limiting the class "from the maximum time period preceding the filing of th[e] complaint, as permitted by the applicable statute of limitation, until such time as the Class period closes." [9] (*See Amend. Compl.* at ¶ 23). The issue of the applicable statutes of limitations is relevant not only to the amount of damages recoverable, but also impacts the definition of the class. Obviously potential class members will be included or excluded depending on whether the limitations period on each claim has run. Therefore, in order for the class to be defined in a way that will be manageable for purposes such as providing notice to potential members, the applicable limitations period or periods must be specifically identified.

In an effort to address this issue, Plaintiffs filed the compendium of state statutes, which includes information with respect to the limitations periods in each of the fifty jurisdictions to be included in the potential class. (*See Compendium of State Statutes, Exh. to Motion* [D.E. 56–4, 56–5] ). Plaintiffs point out that courts in other multi-state class actions have addressed issues of varying state law by certifying subclasses. *See Walsh v. Ford Motor, Co.*, 807 F.2d 1000, 1017 (D.C.Cir.1986). Plaintiffs suggest that jurisdictions with identical limitations periods could be grouped together in a subclass. (*See Oral Argument* at 26–27). The statutory limitations periods laid out by Plaintiffs in their compendium range from three to twenty years. Aside from their assurances at oral argument that dividing the class into subclasses would serve to rectify class definition problems, Plaintiffs have not presented a proposed subclass scheme.

FedEx correctly points out that in addition to the issue of varying limitations periods for each jurisdiction, there are also employees whose employment agreements included an express limitations period. (*See Opposition* at 6). The employment agreements signed by certain employees limit the time for filing suit to six months.[10] (*See id.*). While some states recognize contractual provisions that create limitations periods shorter than the statutory period, other states refuse to give effect to such provisions. *See Maxcess, Inc. v. Lucent Tech., Inc.*, 433 F.3d 1337, 1340–41 (11th Cir.2005) (noting that in New York, courts recognize a contractual limitations period shorter than the statutory provision, but in Florida, Section 95.03, Florida Statutes, provides that any such contractual provision is void). A proper examination of the limitations period applicable to potential class members with six-month provisions in their agreements would accordingly require a determination as to which jurisdiction's law governs the agreement. Such an inquiry would entail examination of state choice of law rules, which might also include consideration of where the contract was entered into, the employee's residence, and where the breach occurred, among other factors. This inquiry is necessarily individualized, and is not addressed by Plaintiffs' definition of the proposed class.[11]

---

**9.** The proposed date for closing the class period is April 1, 2006 for claims regarding pre and post shift work, and July 2006 for claims regarding unpaid break interruption. (*See Oral Argument* at 27–28).

**10.** The six-month limitations period specified in FedEx employment agreements has been upheld by other courts. *See Badgett v. Fed. Express Corp.*, 378 F.Supp.2d 613, 626 (M.D.N.C.2005).

**11.** The statute of limitations issue may also prevent common questions from predominating among class members under Rule 23(b)(3). *See Rosen v. Chrysler Corporation*, 2000 WL 34609135, at *12 (E.D.Mich.2000) (addressing varying state statutes of limitations in a consumer fraud class action as an affirmative defense and finding they created individual inquiries concerning when the elements of the claim arose, thus preventing predominance of common questions under Rule 23(b)(3)).

It is difficult to imagine how Plaintiffs could correct the defects with respect to their definition of the proposed class. Because Plaintiffs fail to satisfy any of the Rule 23(b) requirements, however, the undersigned does not invite a request by Plaintiffs to seek to rectify the inadequate class definition.

### B. *Plaintiffs' proposed class satisfies the requirements of Rule 23(a).*

Notwithstanding the determination that Plaintiffs' proposed class fails scrutiny under Rule 23(b), the analysis required by Rule 23(a) is first addressed.

#### 1. *Numerosity*

■ Because the proposed class is not adequately defined, if class definition were considered a part of the numerosity analysis of Rule 23(a)(1), the proposed class would fail to meet that requirement. However, the other aspect of numerosity—whether the potential number of class members "should raise a presumption that joinder would be impracticable," *E.E.O.C. v. Printing Indus. of Metro. Washington, D.C., Inc.,* 92 F.R.D. 51, 53 (D.D.C.1981) (citation omitted)—has clearly been met. Plaintiffs claim there are 100,000 or more potential class members, obviously making joinder impossible. (*See Motion* at 5).

#### 2. *Commonality*

■ "Commonality requires that there is at least one issue affecting all or a significant number of proposed class members." *Leszczynski v. Allianz, Inc.,* 176 F.R.D. 659, 671 (S.D.Fla.1997) (citing *Stewart v. Winter,* 669 F.2d 328 (5th Cir.1982)). "[T]he commonality prerequisite does not require that *all* of the questions of law and/or fact be common." *Walco Invs., Inc. v. Thenen,* 168 F.R.D. 315, 325 (S.D.Fla.1996) (citing *Cox v. Am. Cast Iron Pipe Co.,* 784 F.2d 1546, 1557 (11th Cir.1986) (emphasis in original)). In fact, "[t]he threshold for commonality is not high .... [and f]actual differences between class members do not necessarily preclude a finding of commonality." *Leszczynski,* 176 F.R.D. at 671 (citations omitted). " 'The requirement is met if the questions linking the class members are substantially related to the resolution of the litigation even though

the individuals are not identically situated.' " *Collins v. Int'l Dairy Queen, Inc.,* 168 F.R.D. 668, 673–74 (M.D.Ga.1996) (quoting *Coleman v. Cannon Oil Co.,* 141 F.R.D. 516, 521 (M.D.Ala.1992)).

Plaintiffs assert there are common questions of contract law existing among all members of the proposed class. (*See Motion* at 5–6). They also contend that common questions of fact exist in that all potential members were subject to FedEx's alleged policy of failing to pay for all time worked. (*See id.* at 8–12). The existence of the documents making up the alleged contracts is undisputed; all hourly employees signed employment agreements, and the employment manuals were universally available. Also, the company policy that time between manual clock punches and the scheduled work times is unpaid is also an undisputed issue. These two issues are common among the class in spite of obvious concerns regarding whether common issues predominate. In light of the relatively low hurdle that must be surmounted, Plaintiffs have satisfied their burden of establishing commonality.

#### 3. *Typicality*

■ "The key inquiry in determining whether a proposed class has 'typicality' is whether the class representative is part of the class and possesses the same interest and suffers the same injury as the class members." *Medine v. Washington Mut., F.A.,* 185 F.R.D. 366, 369–70 (S.D.Fla.1998)(citing *Kreuzfeld, A.G. v. Carnehammar,* 138 F.R.D. 594, 599 (S.D.Fla.1991)). When evaluating a class for typicality, the district court should " 'focus on whether named representatives' claims have the same essential characteristics as the claims of the class at large.' " *Appleyard v. Wallace,* 754 F.2d 955, 958 (11th Cir.1985) (*quoting De La Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983)). "The typicality requirement may be satisfied despite substantial factual differences, however, when there is a 'strong similarity of legal theories.' " *Murray v. Auslander,* 244 F.3d 807, 811(11th Cir.2001) (quoting *Appleyard,* 754 F.2d at 958). "As is the case with commonality, the requirements of typicality are not high." *Collins,* 168

F.R.D. at 674 (citing *Shipes v. Trinity Indus.*, 987 F.2d 311, 316 (5th Cir.1993)).

Plaintiffs assert their claims are typical because they and all potential class members were subject to the same company-wide policy that allegedly resulted in work being performed without pay. (*See Motion* at 13). Defendants argue that the named Plaintiffs' testimony contradicts their claims with respect to whether contracts actually existed and regarding other issues such as work during unpaid breaks. (*See Opposition* at 22–23). However, because the standard for establishing typicality is not demanding, the named Plaintiffs have made a sufficient showing that their claims are typical of the class. The basis of the representative Plaintiffs' claims is grounded in the identical alleged corporate policy of FedEx applicable to all hourly employees.

### 4. *Adequacy of Representation*

■ In order to properly establish the adequacy of representation requirement of Rule 23(a)(4), the party seeking certification must show: "(1) the class representative has no interests antagonistic to the class and (2) class counsel possesses the competence to undertake the litigation." *Hammett v. Am. Bankers Ins. Co.*, 203 F.R.D. 690, 695 (S.D.Fla.2001) (citing *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726–28 (11th Cir.1987)). The court must be assured that the representative plaintiffs will pursue the claims of the class members with vigor to protect the interests of the unnamed members of the class. *Kirkpatrick*, 827 F.2d at 726. The representative plaintiffs must participate in the case and be sufficiently aware of the litigation. *Id.* at 727.

The named Plaintiffs do not have apparent interests that conflict with potential members of the class. Class counsel has successfully prosecuted a nearly identical action in California, and appears to be well equipped to litigate this case. Furthermore, the representative Plaintiffs appear to be involved in the litigation, as they have each participated in the proceedings through declaration and/or deposition. Therefore, the Rule 24(a)(4) requirements have been satisfied.

### C. *The proposed class does not satisfy the requirements of Rule 23(b).*

#### 1. *Certification under Rule 23(b)(3)*

■ Plaintiffs principally advance that certification is proper under Rule 23(b)(3). To achieve certification under Rule 23(b)(3), the plaintiff class must demonstrate both that common questions of law or fact predominate over inquiries affecting individual class members, and that the class procedure is superior to other methods of adjudicating the claims. The "predominance criterion [under Rule 23(b)(3)] is far more demanding" than the commonality requirement of Rule 23(a). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

In a properly certified Rule 23(b)(3) class, " 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof.' " *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir.1997) (quoting *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1557–58 (11th Cir.1989)). "Common issues of fact and law predominate if they 'ha[ve] a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief.' " *Klay*, 382 F.3d at 1255 (quoting *Ingram v. Coca–Cola Co.*, 200 F.R.D. 685, 699 (N.D.Ga. 2001)). "Common issues will not predominate over individual questions if, 'as a practical matter, the resolution of ... [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues.' " *Cooper*, 390 F.3d at 722 (quoting *Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014, 1023 (11th Cir.1996)). Certification is inappropriate in the event that "plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims." *Klay*, 382 F.3d at 1255 (citing *Perez*, 218 F.R.D. at 273).

The predominance inquiry requires an examination of " 'the claims, defenses, relevant facts, and applicable substantive law,' ... to

assess the degree to which resolution of the classwide issues will further each individual class member's claim against the defendant." *Id.* at 1254 (quoting *Castano*, 84 F.3d at 744).

### a. *Common issues of law do not predominate.*

Plaintiffs assert that certification is proper under Rule 23(b)(3) because FedEx's breach of the alleged employment contracts is a predominating issue of law common to all class members. As described, Plaintiffs contend that the basic tenets of contract law—namely what constitutes a breach of contract—are the same in every jurisdiction included in the proposed class. Plaintiffs endeavor to characterize the contracts as simply as possible: FedEx promised to pay for all time worked; we performed work for which we were not paid. There is little doubt that Plaintiffs oversimplify the issues of law necessary to adjudicate the claims of individual members of the proposed class. The legal questions particular to individual members will predominate over those common among the class, thus precluding certification under Rule 23(b)(3).

Adjudication of a claim for breach of contract necessarily requires clear identification of the operative contracts. Plaintiffs sue for breach of contracts consisting of the employment agreement in conjunction with Section 3–92 of the People Manual, which states FedEx's policy to pay for all time worked. Plaintiffs' reference to the People Manual gives rise to the first of several issues that present individual questions.

In most jurisdictions, provisions of an employment manual standing alone will not create rights contractually enforceable by employees.[12] For example, in Florida, "[i]t is well established ... that policy statements contained in employment manuals do not give rise to enforceable contract rights ... unless they contain specific language which expresses the parties' explicit mutual agreement that the manual constitutes a separate employment contract." *Quaker Oats Co. v. Jewell*, 818 So.2d 574, 576–77 (Fla. 5th DCA 2002) (reversing judgment for plaintiff employees on breach of contract for failure to pay overtime in accordance with provisions set forth in company's employment manual). *But see Panto v. Moore Bus. Forms, Inc.*, 130 N.H. 730, 547 A.2d 260, 264 (1988) ("Because compensation and fringe benefits are usual incidents of th[e employment] relationship, it is generally true that a statement on these subjects by the party who pays the compensation can be viewed objectively ... as meant to be a subject of binding agreement") (internal citation omitted). Many jurisdictions covered by the proposed class reject the proposition that any of the policies in the People Manual form the basis for a breach of contract claim. Others, such as Florida, require specific proof that the parties intended the manual to create enforceable rights.

Determining which jurisdictions permit a contractual claim based on the People Manual provision is a question that must be addressed on an individual basis, or at the very least, by the creation of subclasses. The issue of law Plaintiffs suggest predominates—that FedEx breached its contractual obligation—cannot predominate over individual questions of law where the very terms of the contracts are an open question given the different treatment accorded to employee manuals by the fifty jurisdictions included in the proposed class.

The issue of the applicability of the People Manual is further complicated by the clause explicitly disclaiming the creation of contractual rights. The effect of this provision on the breach of contract claim also may vary within those jurisdictions that do recognize contractually enforceable employment manuals. *See, e.g., Butler v. Walker Power, Inc.*, 137 N.H. 432, 629 A.2d 91, 94 (1993) (although in New Hampshire employment man-

---

**12.** *See Lobosco v. New York Tel. Co./NYNEX*, 96 N.Y.2d 312, 727 N.Y.S.2d 383, 751 N.E.2d 462, 465 (2001) (New York courts have held that "[r]outinely issued employee manuals, handbooks and policy statements should not lightly be converted into binding employment agreements"); *Hemraj v. Fed. Express Corp.*, No. 06–cv–5414, 2007 WL 3124553, at *5 (E.D.N.Y.

Oct.25, 2007) ("[O]ther district courts within the Second Circuit have repeatedly found that FedEx's [Employee] Handbook and [People] Manual do not give rise to an enforceable employment contract.") (citing *Aquinas v. Fed. Express Corp.*, 940 F.Supp. 73 (S.D.N.Y.1996); *Cowen v. Fed. Express Corp.*, 25 F.Supp.2d 33, 37 (D.Conn. 1998)).

uals may give rise to contractual rights, a proper disclaimer may "negate any inference that the handbook alters the presumptively at-will nature of the employment relationship"). Whether the People Manual provisions are part of the alleged contracts is a question that will devolve into individual inquiries into the contract law of every jurisdiction covered by the proposed class.

Even assuming that the contracts as described by Plaintiffs are recognized in every jurisdiction, the terms of People Manual Section 3–92 present further issues preventing a finding of predominance of common issues of law. Section 3–92 states that FedEx pays for all time worked "in accordance with applicable state and federal laws." This provision declares FedEx's policy to comply with the wage and hour laws of individual states as well as the federal Fair Labor Standards Act ("FLSA"). Plaintiffs have failed to demonstrate that this reference to state and federal wage and hour laws will not pose individual questions. FedEx has aptly noted that, at least with respect to the calculation of overtime and damages, state wage and hour laws may cause the action to become unmanageable.[13] Indeed, courts have found a class asserting claims under the wage and hour laws of multiple states to lack commonality. In *Luciano v. Eastman Kodak, Co.*, the court noted:

> The state wage and contract claims lack commonality because they are being brought under 34 separate wage laws, each with its own peculiar requirements and defenses. Similarly, the breach of contract claims are being brought pursuant to the laws of 48 jurisdictions. Because adjudication of these claims would require the interpretation and application of several different laws of several different states and

territories ... plaintiff has failed to establish that the state wage and contract claims of the purported class are common amongst the class.

No. 05–cv–6463T, 2006 WL 1455477, at *3 (W.D.N.Y. May 25, 2006) (citing *Kaczmarek v. IBM*, 186 F.R.D. 307, 312–313 (S.D.N.Y. 1999)).[14]

Additionally, Section 3–92 provides that employees are not to work "off the clock" except for certain approved preliminary and post-liminary activities. Plaintiffs have not explained the impact of this provision on their breach of contract claim. Given that Plaintiffs assert 3–92 is part of the contracts, it would appear relevant to the analysis of their claim to consider whether Plaintiffs themselves violated this term of their contracts by performing work off-the-clock. The interpretation of this clause may present individual inquiries into whether a given class member knew of the contract and knew of the prohibition. Furthermore, Plaintiffs have not provided a definition of what constitutes compensable work under the contracts. There is a distinct possibility that the various rules of contract interpretation in the fifty jurisdictions would not treat these questions similarly and spurn further individualized legal inquiries. Without an exhaustive analysis prior to certification, which the parties have not done, the undersigned has no way of knowing the answer.

Arguing that courts regularly certify nationwide classes in breach of contract suits, Plaintiffs cite to several cases that purportedly support this position. In each of these cases, however, the class was either not actually nationwide and/or the claim was based

---

**13.** While individualized damages issues alone do not prevent a finding that common issues predominate, *see Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir.2003), here there are potentially fifty-variant statutory schemes that must be applied to calculate damages. This, in combination with the other individualized legal issues and the predominating individual factual issues discussed, clearly weighs against a finding that common issues predominate.

**14.** *See also Glewwe v. Eastman Kodak Co.*, No. 05–cv–6462T, 2006 WL 1455476, at *2 (W.D.N.Y. May 25, 2006); *Neary v. Metro. Prop. & Cas. Ins. Co.*, 472 F.Supp.2d 247, 253 (D.Conn.2007) (declining to exercise supplemental jurisdiction under the FLSA over class claims brought pursuant to wage and hour laws of every state because "given the broad range of state wage and hour statutes and issues implicated, such matters would 'substantially predominate,' in addition to potentially raising 'novel or complex' questions of state law").

on breach of a written form contract.[15] In cases where the underlying agreement was a form contract, the enforceability and existence of the contract under the laws of the various covered jurisdictions were generally not issues, thus reducing the possibility that individual inquiries would predominate.

Plaintiffs also place much weight on the Eleventh Circuit's discussion of the law of breach of contract in *Klay*, 382 F.3d at 1262–64. In *Klay*, the district court certified a nationwide plaintiff class consisting of physicians who alleged that defendant health maintenance organizations ("HMO[s]") breached form contracts governing reimbursement. *Id.* at 1261. The Eleventh Circuit reversed the district court's certification, finding that the individualized issues of fact related to the overwhelming number of different form contracts and the individualized proof physicians would be required to offer to substantiate their claims far outweighed the common issue of law regarding breach. *Id.* at 1262–67. Despite reversing certification, the court observed that the definition of breach of contract was a common question of law that did not substantially vary by state: "[a] breach is a breach is a breach, whether you are on the sunny shores of California or enjoying a sweet autumn breeze in New Jersey." *Id.* at 1263.

While Plaintiffs in the instant case have also asserted that the question of breach is common among members, as in *Klay*, the issue here is overshadowed by individual questions. As described, individual inquiries of law related to defining the operative contracts in the jurisdictions at issue prevail over the common question of breach.[16] Addi-

tionally, the individual issues of fact discussed below supercede and predominate over the common question of "a breach is a breach is a breach."

Plaintiffs have not presented any other case where a court certified a nationwide class alleging breach of employment contracts, the terms of which varied over time and are subject to varying rules of construction depending on the applicable state law. In sum, the legal issues presented by the proposed class are not conducive to adjudication as a nationwide class action. In a similar case recently brought on behalf of a nationwide class of employees for breach of contract and unjust enrichment, the court observed:

> Plaintiff has brought two claims, both of which are based on the cross-section between a state's contract law and its employment law.... [B]y asking for a nationwide class, the Plaintiff wishes to implicate and litigate together the varying contract and employment laws of all fifty states. To do so would be absurd and clumsy. It is near-axiomatic that the fifty distinct states have given disparate treatment to these areas of the law.... Allowing a nationwide class in this case would create cumbersome proceedings with numerous individualized inquiries overshadowing and confusing the generalized inquiry.

*Vega v. T-Mobile USA, Inc.*, No. 06–cv–20554, 2007 WL 1364333, at *2 (S.D.Fla. May 8, 2007). The Eleventh Circuit has noted that " '[t]o establish commonality of the applicable law, nationwide class action movants must credibly demonstrate, through an ex-

15. *See Allapattah Servs., Inc.*, 333 F.3d at 1260–61 (breach of written dealer agreements for wholesale of gasoline); *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32 (1st Cir.2003) (class covering two states based on breach form contract for cellular telephone service); *Winkler v. DTE, Inc.*, 205 F.R.D. 235 (D.Ariz.2001) (class of individuals who purchased used vehicles at one dealer in Arizona for breach of form sales contracts under Arizona law); *Kleiner v. First Nat. Bank of Atlanta*, 97 F.R.D. 683 (N.D.Ga. 1983) (proposed class including five states for breach of form loan agreements); *In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768 (3d Cir.1995) (settlement class not including a breach of contract claim).

16. Addressing an identical argument with respect to the language from *Klay* regarding the commonality of breach across jurisdictions, another court noted that "while a breach may be a breach anywhere, that is not the end of the legal test for breach of contract in Florida. Florida contract law requires that in a breach of contract action, the breach in question must be material." *Marino v. Home Depot U.S.A., Inc.*, 245 F.R.D. 729, 734 (S.D.Fla.2007) (citing *J.J. Gumberg Co. v. Janis Servs., Inc.*, 847 So.2d 1048, 1049 (Fla. 4th DCA 2003)). The court concluded that "[t]he need to apply the nuances of the contract law of fifty states to Plaintiffs proposed class leads to the conclusion that common issues of law or fact do not predominate." *Id.* at 736.

tensive analysis of state law variances, that class certification does not present insuperable obstacles.'" *Klay*, 382 F.3d at 1262 (quoting *Walsh*, 807 F.2d at 1017). Plaintiffs have not met this burden, as individual legal issues will predominate over those common among class members.

### b. *Common issues of fact also do not predominate.*

Plaintiffs contend that the issue of whether FedEx had a company-wide policy of not compensating hourly employees for all time worked is a common question of fact that predominates over individual inquiries. However, as noted by FedEx, the time records produced by FedEx as well as the statistical analysis completed by Dr. Drogin do not indicate whether employees were actually working during gap periods. Indeed, testimony from employees, including named Plaintiffs, supports the conclusion that employees may have been engaged in a variety of non-work related activities during some of the gap periods. With respect to work during unpaid breaks, FedEx has shown many individual reasons why a scan could have occurred while the employee was recording a break code, and has also shown that such scans were not frequent among a substantial majority of employees. Two similar cases provide guidance on this factual predominance inquiry.

In *Basco v. Wal–Mart Stores, Inc.*, 216 F.Supp.2d 592 (E.D.La.2002), the court considered certification of a class of hourly Louisiana employees alleging Wal–Mart breached its contract with them by failing to pay for time worked off-the-clock. The court found predominance of factual inquiries regarding off-the-clock work lacking, because "individualized issues will arise from the myriad of possibilities that could be offered to explain why any one of the plaintiffs worked off-the-clock." *Id.* at 603. These individual questions included, for example, whether the employee did in fact work, whether the employee unreasonably failed to seek compensation for the off-the-clock work performed, and whether the employee knew of Wal–Mart's policy prohibiting off-the-clock work and chose to engage in it anyhow. *Id.* The *Basco*

plaintiffs endeavored to "cure the individualized nature of their contract and 'work off-the-clock' claims, in part, by employing statistical analysis to determine the global number of rest and meal breaks taken by employees and the number of hours worked off-the-clock for the entire Wal–Mart workforce in Louisiana during a period of time." *Id.* The court found the statistical studies based on employee time records offered by the plaintiffs "ignor[ed] the highly individualized issues involved in the case," such as reasons for employees missing or working during breaks and defenses available to Wal–Mart justifying or explaining the work. *Id.* The court also noted that the use of representational samples by plaintiffs to prove damages "would deprive defendants of their right to have a jury determine liability and damages as to each plaintiff and fly in the face of established contract law." *Id.* at 604.

Similarly, in *Cornn v. United Parcel Service, Inc.*, No C03–2001, 2005 WL 2072091 (N.D.Cal. Aug.26, 2005), the court denied certification of a class of hourly United Parcel Service ("UPS") workers asserting they were not paid for work performed in a beginning shift gap period identical to the period alleged in this case. Although the plaintiffs in *Cornn* did not bring their claim as a breach of contract, given the factual similarity between FedEx's and UPS' policies, the court's discussion with respect to predominance is highly instructive. In *Cornn*, UPS had a policy substantially similar to FedEx's, requiring hourly employees to punch-in before the scheduled start time, but only compensating employees beginning at the scheduled start time. *Id.* at *1. The *Cornn* plaintiffs asserted they performed work activities during the gap periods, such as changing into uniforms, gathering equipment, and loading packages onto cars. *Id.* at *2. They attempted to substantiate their claim through time records as well as the testimonial evidence of a group of employees.

The court found that the evidence supporting certification did not demonstrate a

> common practice among package-car drivers as to when they punch in to work. Some drivers may punch in immediately

after arriving at the building, while others may punch in just before their scheduled start times.... [D]rivers perform a variety of non-work-related tasks, such as socializing, reading the newspaper, and drinking coffee or tea, after punching in but before their scheduled start times. If a driver punched in thirty minutes prior to his or her scheduled start time but actually did no work during that time, then UPS's practice of calculating hours worked based on the scheduled start time would not be unlawful.

*Id.* at *5 (internal citations omitted). The court concluded that because it could not "determine whether a driver performed work during the interval in question without undertaking individualized inquiries that predominate over any common questions, class certification would be inappropriate." *Id.*

*Basco* and *Cornn* highlight the individualized nature of the factual inquiries that would arise should this case be adjudicated as a class action. With respect to gap period work, there are innumerable reasons why an employee may have arrived at the FedEx facility early on any given day. While those reasons may in fact relate to completing work, they may also relate to a plethora of non-work activities such as socializing, checking e-mail, beating traffic, etc. Likewise, the end of day gap periods may also have been the result of employees staying late at the facility to engage in non-work related activities. FedEx has offered statements and testimony of a number of employees who have provided such plausible explanations for what occurred during the gap periods. The statistical evidence proffered by Plaintiffs does not account for time spent doing activities other than work and cannot alone establish that work was performed. Permitting these claims to proceed as a class action would deprive FedEx of the ability to explore whether an individual employee was engaged in non-work activities during the gap period and would thus limit FedEx's ability to properly defend the claims.

Similarly, individual issues are apparent with respect to Plaintiffs' claimed work during unpaid breaks. Many employees, including named Plaintiffs, stated they did not work during unpaid breaks, although their time records indicate scans occurring during breaks. These scans could be evidence that work was being performed during the break, but could also have been caused by the after-the-fact entry of break codes into the electronic time system. Moreover, in the event an employee did work during unpaid breaks, individual inquiries would be necessary to determine the amount of time actually spent. FedEx has explained that scanning a package can take between two and twenty seconds depending on the complexity of the transaction. (*See Oral Argument* at 54). However, the time records produced by FedEx and studied by Plaintiffs' expert to develop his opinion only show the number of scans that occurred during a break, not how long the employee was allegedly working when the scan occurred. Determining the amount of actual work that occurred in conjunction with the scans or whether any work was actually completed would be an inquiry individual to each employee who had scans during unpaid breaks.

### c. Class treatment is not superior to other methods of adjudication.

■ In light of the determination that individual issues of law and fact predominate over issues common among class members, the class procedure is not superior to other methods of adjudication. Rule 23(b)(3) lists various factors the court should consider in evaluating the superiority of class treatment. Most pertinent here are "the likely difficulties in managing [the] class action." Fed. R.Civ.P. 23(b)(3)(D). As explained, there are serious questions regarding the individual inquiries that should be undertaken to allow FedEx an opportunity to defend against Plaintiffs' claims. Engaging in such inquiries will cause the adjudication of the over 100,000 potential employees' claims to become unmanageable, burdensome, and would unreasonably tax scarce judicial resources. Due to these individual differences, proceeding with this case as a class action is not the superior vehicle for litigating potential class members' claims.

### 2. Certification under Rule 23(b)(1)(A)

Plaintiffs' summary conclusion that certification is permissible under Rule 23(b)(1)(A) is easily disposed of. (*See Motion* at 14).

Under Rule 23(b)(1)(A), the proponents of certification must establish that prosecuting individual actions would create the risk of inconsistent adjudications causing incompatible standards of conduct for the party opposing certification. The Eleventh Circuit has held that certification under Rule 23(b)(1)(A) is unavailable where the plaintiff class seeks compensatory damages. *See Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1078 n. 7 (11th Cir.2000) (citing *In re Dennis Greenman Sec. Litig.*, 829 F.2d 1539, 1545 (11th Cir.1987)). In *Greenman*, the Eleventh Circuit explained that in cases seeking compensatory damages the risk of "inconsistent standards for future conduct [is] not created because a defendant might be found liable to some plaintiffs and not to others." *Greenman*, 829 F.2d at 1545 (citing *In re Bendectin Prods. Liab. Litig.*, 749 F.2d 300, 305 (6th Cir.1984)). Instead, certification under this section is generally appropriate "only [in] actions seeking declaratory or injunctive relief...." *Id.* (citing *Abramovitz v. Ahern*, 96 F.R.D. 208, 215 (D.Conn.1982)).

Plaintiffs seek compensatory damages for FedEx's alleged breach of contract. (*See Amend. Compl.* at 13). If Plaintiffs individually pursued their claims against FedEx it is quite possible that FedEx might be found liable to some and not to others, but these divergent outcomes would likely result from the particular facts and law underlying each employee's contract claims. This result would not create incompatible standards of conduct for FedEx because each claim is fact specific. In *Cohen*, the Eleventh Circuit found certification under Rule 23(b)(1)(A) inappropriate where both injunctive relief and compensatory damages were sought. 204 F.3d at 1077. Certification under Rule 23(b)(1)(A) is likewise inappropriate here.

### III. *CONCLUSION*

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Plaintiffs' Motion for Class Certification [**D.E. 56**] is **DENIED.**

**DONE AND ORDERED.**